## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SNEHA IYER<br>513 Salem Heights Drive<br>Gibsonia, PA 15044<br><br>                    *Plaintiff,*<br><br>v.<br><br>GEORGE WASHINGTON UNIVERSITY<br>SCHOOL OF MEDICINE AND HEALTH<br>SCIENCES<br>2300 I Street, NW<br>Washington DC 20037<br><br>DEAN STEVEN DAVIS<br>Assistant Dean for Student Affairs<br>2300 I Street, NW<br>Washington, D.C. 20037<br><br>and<br><br>DR. NANCY GABA<br>Chair of Department of Obstetrics<br>and Gynecology<br>2300 I Street, NW<br>Washington, D.C. 20037<br><br>                    *Defendants.* | Civil Action No. |

### COMPLAINT AND DEMAND FOR JURY TRIAL

COMES NOW, Plaintiff SNEHA IYER ("Plaintiff" or "Ms. Iyer"), by and through her undersigned attorney, and hereby complains and alleges against the above-named Defendants, based upon knowledge, information and a reasonable belief derived therefrom, as follows:

### INTRODUCTION

1.      Ms. Iyer seeks damages and injunctive relief to remedy violations of her rights secured by the Americans with Disabilities Act of 1990, as amended ("ADA"), and Section 504 of

1

the Rehabilitation Act of 1973 ("Section 504"), for breach of contract and for intentional infliction of emotional distress, by GEORGE WASHINGTON UNIVERSITY SCHOOL OF MEDICINE AND HEALTH SCIENCES ("GW"), the professional medical school of George Washington University, DEAN STEVEN DAVIS ("Dean Davis"), and DR. NANCY GABA ("Dr. Gaba," together with Dean Davis, collectively, the "Individual Defendants"), in relation to the wrongs Plaintiff suffered.

2.    Ms. Iyer tolerated pervasive discrimination and retaliation after she filed complaints against Dean Davis, and Dr. Gaba who abused and mistreated Ms. Iyer, causing symptoms of her disability to be exacerbated.   GW faculty treated similarly situated students differently from Ms. Iyer based on her religious affiliation and disability.

3.    Despite GW offering Ms. Iyer a hearing regarding letters of concern filed against her by Dean Davis and Dr. Gaba, GW faculty refused to evaluate evidence submitted by Ms. Iyer that demonstrates she did not violate any school policy concerning professionalism.   GW also failed to properly investigate the complaints Ms. Iyer filed against Dean Davis and Dr. Gaba.

4.    GW dismissed Ms. Iyer, which caused her to withdraw from her matched residency at the University of Washington due to GW's discriminatory and retaliatory actions.   GW's actions caused her emotional distress, lost income, and derailed her career path.   GW also failed to comply with its own mistreatment policy that protects students from mistreatment by GW faculty and staff and its non-discrimination policy, constituting a breach of contract.

5.    Accordingly, Ms. Iyer now petitions this Court for redress in the form of injunctive relief, damages, costs and reasonable attorney's fees in relation to the violation of her rights, as well as damages for breach of contract and intentional infliction of emotional distress pursuant to District of Columbia common law.

///

## **PARTIES**

6.      Plaintiff, SNEHA IYER, is currently a resident of the Commonwealth of Pennsylvania presently residing at the address set forth in the caption above.   At all times relevant herein, Ms. Iyer was a qualified student at GW Medical School in Washington. D.C.

7.      Defendant, GEORGE WASHINGTON UNIVERSITY SCHOOL OF MEDICINE AND HEALTH SCIENCES, is the professional medical school of The George Washington University, a private university incorporated by an act of the United States Congress in 1821.[1]   GW has its principal place of business in Washington, D.C., and qualifies as a place of public accommodation under the ADA and the applicable federal regulations.  *See* 42 U.S.C. § 12182(7)(j); 28 C.F.R. 36.102(a)(3).

8.      Defendant DEAN STEVEN DAVIS is a resident of Washington, D.C. and, upon information and belief, presently resides at the address set forth in the caption above.  At all times relevant herein, Mr. Davis was the Assistant Dean for Student Affairs at GW.   Dean Davis is being sued in his individual capacity.

9.      Defendant DR. NANCY GABA is a resident of Washington, D.C. and, upon information and belief, presently resides at the address set forth in the caption above.  At all times relevant herein, Dr. Gaba was the Chair of Department of Obstetrics and Gynecology at GW.   Dr. Gaba is being sued in her individual capacity.

10.      At all times relevant hereto, and in all the actions described herein, Defendants' actions took place in Washington, D.C.

///

---

[1] The congressional charter established Columbian College in the District of Columbia, George Washington University's predecessor school.  William F. Zeman, "Today in D.C. History: Charter Signed for GW's Predecessor School," *Washington City Paper* (February 9, 2011) (Archived from the original on October 17, 2015; retrieved January 5, 2024 https://washingtoncitypaper.com/article/467716/today-in-d-c-history-charter-signed-for-gwus-predecessor-school/).   The name changed to The George Washington University in 1904, in an agreement with the George Washington Memorial Association. *Id.*

11.     Defendants did the acts and omissions hereinafter alleged in bad faith and with knowledge that its conduct violated well established and settled law.

## JURISDICTION

12.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question) because Ms. Iyer asserts claims arising under federal law and pursuant to 28 U.S.C. § 1332 (diversity of citizenship).

13.     Supplemental jurisdiction over Ms. Iyer's pendant state law claims are proper pursuant to 28 U.S.C. § 1367(a), as there exist claims arising out of the same transaction and occurrence as her federal claims.

14.     Venue in this jurisdiction is proper pursuant to 28 U.S.C. § 1391(b), as GW is located in this District, and all of the events giving rise to Ms. Iyer's claims occurred therein.

15.     All conditions precedent to the maintenance of this suit and Ms. Iyer's claims have occurred, been performed or otherwise waived.

## GENERAL FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

16.     Ms. Iyer enrolled as a medical school student at GW in August 2018.

17.     Ms. Iyer has demonstrated since a young age and during medical school that she can handle the rigor and responsibilities expected of a physician.  As a medical student, Ms. Iyer earned respectable grades and never faced any disciplinary or professionalism problems during the first two years of her schooling at GW.  She also excelled in her rotations, received outstanding letters of recommendation from GW faculty members, and matched residency at the University of Washington, a nationally well-respected hospital.

18.     In June 2020, Ms. Iyer began her pediatrics and surgery rotations late because of COVID, as did all other students in her class.  Ms. Iyer's pediatrics and surgery rotation went well.

///

19.     In October 2020, Ms. Iyer began her psychiatry rotation, which was her third rotation, but got sick a few times and had to miss classes and rotations as a result.

20.     Ms. Iyer had doctors' notes documenting her illnesses.

21.     At the end of 2020, complaints regarding Ms. Iyer's professionalism were filed due to Ms. Iyer missing classes due to excused absences.  This included a complaint by another student that contained false statements regarding Ms. Iyer's professionalism.

22.     On March 16, 2021, the Subcommittee on Honor and Professionalism ("Subcommittee") held a hearing regarding these complaints.

23.     During the Subcommittee hearing, Ms. Iyer and other witnesses were interviewed.

24.     During this hearing, one of the Subcommittee members, Dr. Anthony Caputy, muted himself to take a phone call.  He missed part of the hearing during this time, which included when Ms. Iyer was defending herself through her testimony.

25.     The Subcommittee voted to suspend Ms. Iyer for one year and for her to repeat her academic third year.

26.     This Subcommittee's decision was subsequently overturned by the Senior Associate Dean on appeal.  However, Ms. Iyer was required to repeat three rotations that she never previously completed.  Any problems Ms. Iyer experienced thereafter with GW faculty occurred only during these "repeat rotations" where the doctors already knew Ms. Iyer and had preconceived notions about her.

27.     On April 5, 2022, Ms. Iyer started her psychiatry rotation.  This rotation ended on May 13, 2022, and Ms. Iyer earned a passing grade without issue.

28.     Between May 13, 2022, and July 5, 2022, Ms. Iyer completed her anesthesia and dermatology rotations earning high passing grades in both.

///

29.     During the first week of July 2022, Ms. Iyer's internal medicine rotation started where she passed the first half of this rotation.

30.     During the second week of July 2022, Ms. Iyer began the second part of her internal medicine rotation but tested positive for COVID-19.   She reported this to all necessary GW faculty, including the Clerkship Director Dr. Anne Lesburg.

31.     On August 29, 2022, Dr. Lesburg emailed Mr. Iyer stating that all her absences had been accounted for and that Ms. Iyer had no further days to make up for the internal medicine clerkship.

32.     Ms. Iyer subsequently received a failing grade for the second half of her internal medicine rotation, and she was requested to repeat the second half.   Dr. Lesburg admitted that she neglected to tell Ms. Iyer's attending physicians that she had COVID-19 and was excused, which resulted in unexcused absences.   Ms. Iyer appealed this failing grade, but the appeal was not accepted.

33.     On August 29, 2022, Ms. Iyer began her obstetrics/gynecology ("OB/GYN") rotation, which was around the same time she was submitting applications for residency that were due on September 28, 2022.

34.     On September 24, 2022, Ms. Iyer had a meeting scheduled with Advisory Dean, Stephen Davis.   During that meeting, Dean Davis harassed Ms. Iyer both emotionally and sexually.

35.     During their meeting on September 24, 2022, Dean Davis commented that Ms. Iyer looked like a woman with whom he was romantically involved in the past and who rejected him. Dean Davis stated Ms. Iyer reminded him of his "girlfriend from Hawaii who made him hippy dippy and unprofessional to the point of wearing flip flops to graduation and being chastised for being unprofessional on stage," and whom he thought he was going to marry.

///

36.     Dean Davis also swore at Ms. Iyer during the September 24, 2022, meeting by making statements such as she was "fucking it up," that everyone loves a redemption story, and that this could serve as his redemption story as her dean.     Dean Davis also stated, "I hated my medical school.  I want to write them an email saying, 'You know what, motherfuckers?' and sign it with my signature as a Dean."  Dean Davis further stated that "Everyone in the Dean's office are spiders who are trying to climb up."

37.     When Ms. Iyer stated she wanted to ask Dean Richard Simons for help, Dean Davis stated, "Rich won't help you."   Dean Davis also suggested that COVID-19 is a choice.

38.     Dean Davis furthered his emotional mistreatment towards Ms. Iyer when he referenced her father.   He specifically said to her, "Your dad is a physician, right?  I was wondering what I would say if this was my daughter, and I'd be so disappointed in her.   I wouldn't support her. I would tell her that this was her doing … and that's what I would tell her.  There is no way your father is proud of you."

39.     Ms. Iyer's OB/GYN rotation ended on October 7, 2022, and she received a passing evaluation from all three evaluators, including from Dr. Nancy Gaba.   There were no negative remarks concerning Ms. Iyer's professionalism.

40.     On November 16, 2022, Dr. Gaba changed Ms. Iyer's OB/GYN rotation grade from passing to conditional thereby causing Ms. Iyer to endure severe emotional distress and a panic attack.  Dr. Gaba's reasoning was "insufficient clinical time," which was unrelated to allegations of unprofessionalism.

41.     On November 18, 2022, Ms. Iyer had a residency interview scheduled at Allegheny General Hospital.  Ms. Iyer suffered a psychiatric crisis and was unable to attend the scheduled interview.   She was extremely stressed to the point of suffering a panic attack due to Dr. Gaba's action of changing Ms. Iyer's grade to conditional and not replying to her appeal of that grade per

school policy.   Additionally, Dean Davis called Ms. Iyer at the start of her interview, which significantly contributed to her anxiety.

42.     Dr. Gaba alleged that Ms. Iyer's appeal was lost in her email inbox.   Ms. Iyer's anxiety also was heightened after receiving information that another student had passed away. However, Dean Goldberg and Nykiah Betts (the OB/GYN clerkship coordinator) were copied on the email and confirmed they received it.

43.     On September 22, 2022, and October 18, 2022, Dr. Gaba filed letters of concern regarding Ms. Iyer's professionalism related to her OB/GYN clerkship rotation.   Ms. Iyer was not informed about these letters of concern until months later in late November/early December.

44.     Ms. Iyer was permitted to complete her rotations from September 2022 to April 2023 where she worked with patients, and she excelled academically while these letters of concern were pending.

45.     Dr. Gaba's complaint alleged that Ms. Iyer spent four days doing clinical work out of the first three weeks of the rotation, which made it difficult for Dr. Gaba to evaluate Ms. Iyer at the time of her mid-rotation feedback meeting.   Dr. Gaba stated Ms. Iyer allegedly missed five days during week one at Sinai due to COVID-19, one full day of clinic with Dr. Keller, and a genetics assignment and ultrasound assignment due to medical problems.   She also allegedly missed time during outpatient at GW during the fourth week due to different medical problems.

46.     During Ms. Iyer's final two weeks of inpatient rotations at Sinai, she worked four to five days total.   This was due to observation of the Jewish holidays where students were instructed not to go to the hospital.

47.     Dr. Gaba also alleged there were days when Ms. Iyer was sick and sent home, scrubbed out of the operating room due to not feeling well or arrived late.

///

48.     Dr. Gaba acknowledged that three clinical evaluators gave Ms. Iyer passing grades for the time they spent with her during the OBGYN rotation but alleged that the time Ms. Iyer spent with her was insufficient to award her a final grade.

49.     Dr. Gaba accused Ms. Iyer of not attending orientation because of illness.   Ms. Iyer attended the orientation at 8:00 a.m. and participated in the initial activities.   My. Iyer messaged Ms. Betts as she started to feel ill and left to take a COVID test.

50.     Dr. Gaba alleged Ms. Iyer worked with her on Monday, September 12, 2022, in the clinic for a half day.   Ms. Iyer emailed Dr. Gaba on the preceding Friday to let her know that she would be late because Ms. Iyer's preceptor meeting was scheduled from 8:00 a.m. to 9:00 a.m.   Dr. Gaba checked with Ms. Iyer's preceptor who informed her that the meeting was from 7:30 a.m. to 8:30 a.m.   The preceptor sent Dr. Gaba the email she sent to Ms. Iyer's group.

51.     Ms. Iyer sent Dr. Gaba an email on Monday, September 12, 2022, documenting she left the preceptor meeting at 8:30 a.m. and was on her way to reach the clinic by 9:00 a.m.   Ms. Iyer arrived at the clinic around 9:00 a.m.

52.     Dr. Gaba alleged that on Tuesday, September 13, 2022, Ms. Iyer did not show up to the clinic with Dr. Keller at 8:00 a.m. as scheduled and, later that day, Ms. Iyer informed faculty she had a medical emergency.   Ms. Iyer produced a doctor's note that said she should "refrain from physical activity" until September 15, 2022.

53.     In fact, Ms. Iyer sent an email to Dr. Gaba, with Dr. Keller copied, at 7:32 a.m. on September 13, 2022.   This email was not sent later that day as Dr. Gaba alleged.   Ms. Iyer also sent a tiger text to Dr. Keller at 7:42 a.m. who approved the absence.

54.     On September 13, 2022, Dr. Gaba instructed Ms. Iyer to write a detailed H&P based on one of the patients she and Dr. Gaba saw together on September 12, 2022.   This was after Dr.

///

Gaba became aware that Ms. Iyer missed the clinic day with Dr. Keller.  Dr. Gaba asked her to submit the H&P by 5:00 pm on Friday, September 16, 2022.

55.    Ms. Iyer requested an extension until 6:00 p.m. to complete the H&P, which Dr. Gaba granted.   The assignment was sent to Dr. Gaba on time but was allegedly poorly done.   Ms. Iyer's HPI did not include any history, physical exam, assessment or plan.   However, Dr. Gaba previously informed Ms. Iyer that she passed this assignment, and her feedback did not state the assignment was poorly done.

56.    Ms. Iyer also was accused of not attending Student Day, either in person or virtually, on September 14, 2022.  Dr. Gaba asked Ms. Iyer if she could contact her doctor to obtain clarification of the limitations on her activity, as he stated in his note.   Dr. Gaba alleged that Ms. Iyer asked Dr. Gaba not to contact her doctor, as Ms. Iyer was uncomfortable divulging private medical information.

57.    At Dr. Gaba's request, Ms. Iyer provided a second doctor's note.   The second note provided details about Ms. Iyer's physical limitations due to treatment of her lower back and neck. Ms. Iyer received an unexcused absence from Student Day despite the documentation she provided. Dr. Gaba contradicted herself because she had previously sent an email stating that the note was sufficient, and Ms. Iyer's absence was excused.

58.    Dr. Gaba further claimed that on September 15, 2022, Ms. Iyer did not participate in the scheduled genetics session.   Dr. Gaba stated Ms. Iyer confused the time and showed up in the afternoon, virtually, when no patients were scheduled, instead of in the morning.

59.    In fact, Ms. Iyer previously reached out to Lisa Freese, to whom she was assigned for the genetics session for the OB/GYN rotation.   As per the instructions in the email from Ms. Freese, Ms. Iyer could attend the session virtually.  There was one patient scheduled in that session. Ms. Iyer's attendance was confirmed by Lisa Freese.

60.    Dr. Gaba also alleged that on September 16, 2022, Ms. Iyer was scheduled for an ultrasound in the morning, but she did not show up until the afternoon.    Ms. Iyer confused the time and immediately sought out the supervising attending physician, Dr. Susanne Bathgate, to report that she would be unable to stay because of a medical problem.  Dr. Bathgate approved Ms. Iyer's absence, and a doctor's note was provided.  Dr. Bathgate gave Ms. Iyer an assignment to complete. Dr. Gaba alleged Ms. Iyer did not complete the assignment.

61.    When Dr. Gaba asked Ms. Iyer about the incomplete assignment during a meeting, Ms. Iyer allegedly shrugged it off and said she would complete it.  Dr. Bathgate confirmed on September 25, 2022, that Ms. Iyer completed the ultrasound assignment.

62.    Dr. Gaba accused Ms. Iyer of not showing up to the clinic to work with her on Monday, September 19, 2022.

63.    Ms. Iyer produced doctors' notes regarding her absences on September 16, 2022, and September 19, 2022.  Both notes were acknowledged and approved by Dr. Gaba.

64.    On September 20, 2022, Ms. Iyer reported that her EPIC access was limited when she arrived at the clinic with Dr. Keller.  Ms. Iyer attributed her limited ability to see the entire medical record for her patients because she was a fifth-year student.  Ms. Iyer began medical school in 2018 and took a Research Year between her third and fourth years.    She was a fifth-year student during the time of the OB/GYN clerkship, which is why her ID badge expired.

65.    Other fellow students who took Research Years faced similar issues, as communicated in a group chat.  Ms. Iyer was the only student taking a third-year clerkship during the fifth year and therefore faced this issue about her ID badge expiring during the OB/GYN clerkship.

66.    Ms. Iyer's ID badge expired in September 2022.   On September 21, 2022, Ms. Iyer timely arrived for an event at Ross Hall, but her ID was declined.

67.     Ms. Iyer was accused of not attending Grand Rounds or Student Day in person on September 21, 2022.   She signed on to Webex after her ID was declined, which is only available for students at Sinai and AAMC.   Dr. Gaba informed Ms. Iyer that it is her professional responsibility to ensure her ID works for her to participate in required activities.

68.     Dr. Gaba stated Ms. Iyer was one of five students who signed into a lecture on Webex on Student Day.  Dr. Gaba called on several of them, including Ms. Iyer, who did not respond when called on.

69.     When Dr. Gaba asked Ms. Iyer about her not responding when asked a question, Ms. Iyer acted surprised that she had been called on.   Ms. Iyer later stated that she "didn't know the answer" and that is why she did not respond.

70.     Dr. Gaba asked Ms. Iyer if she had time to think about the correct answer after Student Day, and she still had no answer.   Dr. Gaba then asked Ms. Iyer if she remembered what the question was or what was being lectured about.   Ms. Iyer stated that Dr. Gaba was "making her anxious" and did not answer.

71.     Dr. Gaba accused Ms. Iyer of not attending the lecture on Student Day.   However, Ms. Iyer did in fact attend the lecture on Student Day.

72.     Ms. Iyer was scheduled to take a quiz during the lecture on Student Day.  The time of the quiz was announced during the lecture.  Ms. Iyer indeed attended the lecture to take the quiz.

73.     Dr. Gaba accused Ms. Iyer of arriving late on the first day of week five of her OB/GYN rotation.   Ms. Iyer stated she was unaware of the start time, and she thought there was another orientation.   Ms. Iyer was under the impression she had to attend the orientation that started at 7:45 a.m., per instructions from Dr. Gaba.   Ms. Iyer attended the orientation and reached her assigned session shortly after orientation was complete.

///

74.    Ms. Iyer also was accused of leaving the Sinai site early on several days due to illness, but never presented a doctors' note.    But Ms. Iyer did provide a doctor's note with positive COVID-19 test results, which caused her to miss attending sessions at Sinai.

75.    Dr. Gaba reviewed Ms. Iyer's duty hour logs in detail and alleged she found several areas of concern, including two falsifications.   The falsifications included Ms. Iyer entering she worked in Ultrasound with Dr. Bathgate for 3.5 hours from 9:00 a.m. to 12:30 p.m.    Ms. Iyer arrived in the afternoon and promptly went home for medical reasons.

76.    Dr. Gaba also accused Ms. Iyer of adding several hours to clinical time she did not complete.   However, her log hours show she never recorded that she worked from 9:00 a.m. to 12:30 p.m., as alleged by Dr. Gaba.

77.    Dr. Gaba further accused Ms. Iyer of not completing the required night shift during her inpatient assignment.    Ms. Iyer tested positive for COVID-19 causing her to miss attending sessions at Sinai.  Specifically, Ms. Iyer tested positive for COVID at the start of the week during which she was assigned night shift.   Ms. Iyer followed COVID protocol thereafter.

78.    Ms. Iyer's doctor at the Colonial Health Center provided a note to Dr. Gaba and Dean Goldberg.  Ms. Iyer informed Dr. Gaba immediately, who replied confirming Ms. Iyer was excused from school during that week.   Per GW policy, students can miss up to five days excused if they test positive for COVID-19, and those absences do not have to be made up.

79.    On December 1, 2022, Dean Davis filed a letter of concern regarding Ms. Iyer's professionalism.  Dean Davis accused Ms. Iyer of lying to GW faculty about another student's death as a reason for her missing a scheduled residency interview at Allegheny General Hospital.

80.    A letter from Dr. Daniel Shirley sent to GW confirmed that another student had gone missing in the late summer 2022 and did not resurface until December 2022.  The letter explained how worried Ms. Iyer and other friends were regarding this incident.

81.    In January 2023, multiple letters of concern were sent to GW regarding Dr. Gaba's and Dean Davis' mistreatment towards Ms. Iyer.

82.    One letter of concern was from psychiatrist, Dr. Andreea Seicean, who stated she treated Ms. Iyer for anxiety, post-traumatic stress disorder, and attention deficit hyperactivity disorder ("ADHD") since June 2022.  At the beginning of November 2022, Ms. Iyer presented with a significant increase in generalized anxiety disorder and depression following multiple stressors in medical school.   Multiple situations with Dr. Gaba that occurred between September 7, 2022, and November 1, 2022, caused Ms. Iyer's anxiety symptoms to become worse.    These incidents included Dr. Gaba yelling at Ms. Iyer and berating her in front of other staff and trainees and changing her OB/GYN rotation grade from passing to conditional, which caused Ms. Iyer to suffer a full-blown panic attack on November 18, 2022.

83.    Dr. Seicean provided Ms. Iyer's condition met the definition of a disability.   Due to this disability, Ms. Iyer acted out of character on November 18, 2022.  Her experiences with Dr. Gaba and Dean Davis directly resulted in the worsening of Ms. Iyer's symptoms.

84.    Dr. Gauri Bhatnagar also sent a letter of concern to GW regarding Dr. Gaba's mistreatment of Ms. Iyer.   Dr. Bhatnagar observed increased anxiety in Ms. Iyer after she worked with Dr. Gaba.   Dr. Bhatnagar also had a negative experience working with Dr. Gaba during her OB/GYN rotation at GW.

85.    Dr. Bhatnagar described how Dr. Gaba delayed writing letters for students applying for OB/GYN residency and the significant distress Dr. Gaba's actions caused those students.   She feared that other students may have the same experiences with Dr. Gaba in the future.

86.    Nakul Ganju, a medical student, also sent a letter to the Subcommittee with concerns about Dr. Gaba.  Mr. Ganju wrote about his negative experiences with Dr. Gaba during OB/GYN rotations as a medical student at GW.    Dr. Gaba spoke to Mr. Ganju in a patronizing

manner that felt demanding and abusive.   This damaged Mr. Ganju's self-confidence and ability to work with patients, and it worsened his anxiety.

87.     Dr. Gaba created an environment where it was difficult to ask questions as she would attack Mr. Ganju for not understanding concepts.   Mr. Ganju described Dr. Gaba as an individual who creates a toxic learning environment.

88.     Mr. Ganju explained he observed Ms. Iyer during her OB/GYN rotation, that she worked hard and was always present for duties.   Mr. Ganju wanted to speak up about Dr. Gaba's unwarranted bullying of certain students, as he felt Ms. Iyer was subjected to such unprofessional misconduct by Dr. Gaba.

89.     Ms. Iyer provided the Subcommittee with a written response to the letter of concern filed by Dr. Gaba.   Significant documentary proof was attached to the response that supported Ms. Iyer's position that Dr. Gaba's letter of concern contained many inaccurate statements and was further mistreatment towards Ms. Iyer.

90.     Ms. Iyer complained how she emailed Dr. Gaba numerous times asking for help, but Dr. Gaba ignored those emails.   Ms. Iyer shared all of this information with Dr. Jennifer Keller, the Chair of the Mistreatment Committee.

91.     Dr. Keller gave all Ms. Iyer's documents, without permission, to Dr. Alan Wasserman, who thereafter wrote an email indicating he went through Ms. Iyer's confidential school file, which is against school policy.   Moreover, Dr. Wasserman is Dr. Gaba's mentor, creating a conflict of interest.

92.     Ms. Iyer also provided the Subcommittee with a complaint of mistreatment she experienced from Dean Davis.   Ms. Iyer informed the Subcommittee about the harassment she endured from Dean Davis that culminated the issues that occurred in September 2022.

///

93.     Dean Davis made negative statements about how Ms. Iyer would have no chance of being placed into residency, despite her matching with the University of Washington for residency that following March.

94.     Dean Davis refused to help Ms. Iyer when she reached out for it.   Ms. Iyer also documented the sexual harassment and emotional harassment she experienced in the meeting with Dean Davis on September 24, 2022.

95.     On February 9, 2023, Ms. Iyer had her official Subcommittee hearing regarding the letters of concern filed against her.

96.     On March 13, 2023, Ms. Iyer was informed that morning she matched residency at the University of Washington, which was confirmed via email on March 17, 2023.

97.     Also on March 13, 2023, Ms. Iyer received the Subcommittee report that her dismissal from GW was recommended.

98.     The Subcommittee report misquoted Ms. Iyer's psychiatrist, Dr. Andrea Seicean.

99.     Dr. Seicean sent a letter to Dean Barbara Bass documenting the misquotes in the Subcommittee report.   For example, the report falsely documented that Dr. Seicean stated "it was difficult to get the right combination of medications."   However, Dr. Seicean had testified: "I really think that pharmacologically she's doing great.   Also working with her therapist is making a huge noticeable improvement.   She has put in a lot of work into herself, and I think the work she's doing now has really drastically made a difference for her, and in how she presents herself."

100.     The Subcommittee report also contained misquote that, "Dr. Seicean reported that Ms. Iyer was concerned about how other members of the medical team would perceive her given the frequency and severity of the panic attacks."   Dr. Seicean actually stated, "I am not concerned about her personality or capabilities in the clinical setting.   I am not concerned about her interactions with patients.   To the extent that I was concerned, [it] was how other members of the

team may perceive her based on my own experiences with her.  One of the things I noticed about Sneha is that she talks fast, and always has, and what people think is frazzled is just what she comes off as, but it's just anxiety."

101.    Dean Bass failed to reply to Dr. Seicean's letter despite this letter being sent before Dean Bass reached a decision regarding Ms. Iyer's dismissal.

102.    On April 10, 2023, Ms. Iyer met with Dean Bass regarding the dismissal recommendation from the Subcommittee.

103.    On April 12, 2023, Dean Bass sent Ms. Iyer a letter stating she was upholding the dismissal that was recommended by the Subcommittee.

104.    Ms. Iyer was only four weeks shy of graduation when she was dismissed by GW. During the Subcommittee proceedings, she was allowed to participate in rotations, which she completed and excelled in.

105.    Ms. Iyer had to withdraw from her match residency at the University of Washington due to her dismissal.

106.    Meanwhile, another GW medical school student, Samantha Lahav, went through almost the same experiences as Ms. Iyer regarding illnesses and missing clinical rotations during this same time and was treated much differently compared to Ms. Iyer.

107.    Ms. Lahav is Jewish, which is the same religious faith practiced by many GW faculty involved with Ms. Iyer's incidents.   Ms. Iyer is not Jewish.

108.    Ms. Lahav also was diagnosed with COVID-19 during her internal medicine rotation. Ms. Lahav also received a failing grade by the **same** attending physician but was allowed to make-up her missed time, of which she only made up three days because she said she became sick again.

109.    Dr. Lesburg deleted Ms. Lahav's entire failing evaluation and wrote a passing one instead.

17

110.    Ms. Lahav also had an experience in her OB/GYN rotation similar to Ms. Iyer where Ms. Lahav also missed four days.

111.    Ms. Lahav was allowed to make up her missed rotation days, unlike Ms. Iyer who was not allowed to make up her missed days.

112.    Dr. Gaba initially told Ms. Iyer she would be allowed to make up these days after the six weeks were over.   Dr. Gaba never followed through on this assurance despite Ms. Iyer asking about it multiple times because Dr. Gaba ignored Ms. Iyer's emails.  A faculty member ignoring a student's emails is an example of mistreatment per GW's Mistreatment Policy.

113.    As a result of the cumulative actions by Defendants, Ms. Iyer has suffered tremendously, physically, mentally, and emotionally, and her career has been delayed further by Defendants' wrongful acts.

## FIRST CAUSE OF ACTION

### VIOLATIONS OF TITLE II OF THE AMERICANS WITH DISABILITIES ACT, 42 U.S.C. § 12101, et seq., and SECTION 504 OF THE REHABILITATION ACT OF 1973, 29 U.S.C. § 701, et seq. (DISABILITY DISCRIMINATION)
**Against George Washington University School of Medicine and Health Sciences**

114.    Each of the allegations set forth in paragraphs 1 through 113, inclusive, are hereby incorporated by this reference as if realleged fully herein.

115.    Ms. Iyer is a student with disabilities that substantially limit major life activities. Ms. Iyer suffers from a general anxiety disorder and ADHD.

116.    Title II of the ADA provides, "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation."

///

117.    Section 504 provides, "No otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance"  29 U.S.C. § 794(a).  Because the language of these two provisions is substantially similar, claims under both acts are generally analyzed together.

118.    As an institution of public accommodation, GW is subject to the mandate of the ADA and receives federal financial assistance, as defined by 29 U.S.C. § 794, including through the receipt of federal student aid funds, and, as such, may not discriminate against a person because of her disabilities.

119.    GW faculty were aware of Ms. Iyer's disability and her disability-related symptoms, and this was documented with the GW Disability Services Office since Ms. Iyer's first year of medical school.

120.    GW discriminated against Ms. Iyer on the basis of her disability, in instances including, but not limited to, when:

    a)    GW faculty filed letters of concern against Ms. Iyer with allegations of misconduct in connection with symptoms of her disability.

    b)    GW's Subcommittee refused to evaluate evidence submitted by Ms. Iyer at a hearing that demonstrated the allegations in the letters of concern against her were inaccurate and discriminatory.

    c)    Ms. Iyer was subjected to mistreatment by Dean Davis and Dr. Gaba that exacerbated her anxiety, including them berating and emotionally abusing Ms. Iyer during meetings.

    d)    Dr. Gaba refused to help Ms. Iyer with problems she faced as a medical student in connection with her disability symptoms despite repeated requests.

e)   GW dismissed Ms. Iyer from the medical school based on symptoms related to her disability.

f)   GW's Subcommittee report misquoted Ms. Iyer's psychiatrist, Dr. Andreea Seicean's testimony at the hearing and GW did nothing to remedy this issue after it was raised before Dean Barbara Bass.

g)   GW dismissed her from the medical school when she was only four weeks shy of graduation.

h)   GW faculty treated other similarly situated students who are not disabled more favorably and differently than Ms. Iyer by allowing those students to make up missed clinical rotations due to illness, and by changing their failing evaluations to passing, while Ms. Iyer was not afforded the same opportunities.

i)   GW failed to investigate and take appropriate corrective action after Ms. Iyer filed complaints about harassment and mistreatment against Dean Davis and Dr. Gaba.

121.   GW's discriminatory actions were taken solely because of Ms. Iyer's disability, including her disability-related symptoms and her filing complaints against GW faculty who exacerbated her symptoms due to their abuse and harassment.

122.   As a direct and proximate result of GW's unlawful discrimination against Ms. Iyer in violation of the ADA and Section 504, Ms. Iyer has suffered and continues to suffer damages academically, financially, and emotionally in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00).

123.   It has been necessary for Ms. Iyer to obtain the services of an attorney to prosecute this action, and Ms. Iyer is entitled to an award of attorney's fees and costs of suit incurred herein.

124.     Ms. Iyer is entitled to injunctive and declaratory relief to obtain readmission to GW free from discrimination, and for an order forbidding GW from further perpetuating negative acts against her professionally, personally and academically, and from committing any other acts of discrimination.

## SECOND CAUSE OF ACTION

### VIOLATIONS OF TITLE II THE AMERICANS WITH DISABILITIES ACT, 42 U.S.C. § 12203(a), and SECTION 504 OF THE REHABILITATION ACT OF 1973, 29 U.S.C. § 701, et seq. (RETALIATION)
**Against George Washington University School of Medicine and Health Sciences**

125.     Each of the allegations set forth in paragraphs 1 through 124, inclusive, are hereby incorporated by this reference as if realleged fully herein.

126.     The ADA's retaliation statute provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a). The standard for retaliation claims under Section 504 is the same as the standard for retaliation claims under the ADA.

127.     Ms. Iyer engaged in protected activity, including, but not limited to, when she filed complaints against Dr. Gaba and Dean Davis for their mistreatment and abuse towards her that exacerbated her anxiety.

128.     Ms. Iyer was subjected to several adverse actions directly related to the complaints she filed against Dr. Gaba and Dean Davis, including, but not limited to, when:

      a)     Ms. Iyer was subjected to an adverse action during the hearing when GW's Subcommittee refused to evaluate evidence submitted by Ms. Iyer that

demonstrated the allegations in Dr. Gaba and Dean Davis' letters of concern were inaccurate.

b)      Ms. Iyer was subjected to an adverse action when shortly after she filed complaints against Dean Davis and Dr. Gaba, GW dismissed Ms. Iyer from the medical school.

c)      Ms. Iyer was subjected to an adverse action when the Subcommittee report misquoted Ms. Iyer's psychiatrist, Dr. Andreea Seicean's testimony at the hearing, and GW did nothing to remedy this issue after it was raised before Dean Barbara Bass.

d)      Ms. Iyer was subjected to an adverse action when GW dismissed her from the medical school when she was only four weeks shy of graduation.

e)      Ms. Iyer was subjected to an adverse action when GW faculty treated other similarly situated students of Jewish faith differently than Ms. Iyer by allowing a Jewish student to make up missed clinical rotations due to illness, and by changing failing evaluations to passing.

f)      Ms. Iyer was subjected to an adverse action when GW faculty treated other similarly situated students who are not disabled differently than Ms. Iyer by allowing those students to make up missed clinical rotations due to illness, and by changing failing evaluations to passing.

g)      Ms. Iyer was subjected to an adverse action when GW failed to investigate and take appropriate corrective action after Ms. Iyer filed complaints against Dean Davis and Dr. Gaba.

///

22

h)      Ms. Iyer was subjected to an adverse action when she had to withdraw from her matched residency at the University of Washington due to her dismissal from GW.

129.    There is a direct causal connection between Ms. Iyer's protected activity of filing complaints against GW faculty and the adverse actions she faced given that the events happened closely together, and Ms. Iyer's dismissal was in response to the complaints she filed against Dean Davis and Dr. Gaba.

130.    GW wrongly retaliated against Ms. Iyer, all in violation of her rights pursuant to the ADA and Section 504, inflicting mental and emotional distress, and causing further damage to her health, well-being, academic and professional careers, because she is disabled.

131.    As a direct and proximate result of GW's unlawful retaliation against Ms. Iyer in violation of the ADA and Section 504, Ms. Iyer has suffered and continues to suffer damages academically, financially, and emotionally in an amount to be proven at trial.

132.    It has been necessary for Ms. Iyer to obtain the services of an attorney to prosecute this action, and Ms. Iyer is entitled to an award of attorney's fees and costs of suit incurred herein.

133.    Ms. Iyer is entitled to injunctive and declaratory relief to obtain readmission to GW free from discrimination, and for an order forbidding GW from further perpetuating negative acts against her professionally, personally and academically, and from committing any other acts of retaliation.

///

**THIRD CAUSE OF ACTION**

*VIOLATIONS OF TITLE II OF THE AMERICANS WITH DISABILITIES ACT,*
*42 U.S.C. § 12101, et seq.*
*(DISABILITY HARASSMENT)*
**Against George Washington University School of Medicine and Health Sciences**

134.    Each of the allegations set forth in paragraphs 1 through 133, inclusive, are hereby incorporated by this reference as if realleged fully herein.

135.    Ms. Iyer is a student with disabilities that substantially limit major life activities.  Ms. Iyer suffers from a generalized anxiety disorder and ADHD, which qualify as disabilities.

136.    As provided by Dr. Seicean who treated Ms. Iyer for her generalized anxiety disorder, post-traumatic stress disorder, and ADHD since June 2022, Ms. Iyer's condition met the definition of a disability under the ADA and Section 504.

137.    At the beginning of November 2022, Ms. Iyer presented to Dr. Seicean with a significant increase in generalized anxiety disorder and depression following multiple stressors in medical school.  Multiple situations with Dr. Gaba that occurred between September 7, 2022, and November 1, 2022, caused Ms. Iyer's anxiety symptoms to become worse.  This included Dr. Gaba yelling at Ms. Iyer and berating her in front of other staff and trainees and changing her OB/GYN rotation grade from passing to conditional.

138.    As further provided by Dr. Seicean, these multiple stressors led to Ms. Iyer suffering a full-blown panic attack on November 18, 2022.  The worsening of her symptoms were a direct result of her experiences with Dr. Gaba and Dean Davis.  Due to this disability, Ms. Iyer acted "out of character" on November 18, 2022.

139.    Dr. Seicean testified at Ms. Iyer's Subcommittee hearing that: "I really think that pharmacologically she's doing great.  Also working with her therapist is making a huge noticeable improvement.  She has put in a lot of work into herself, and I think the work she's doing now has

24

really drastically made a difference for her, and in how she presents herself." Dr. Seicean further testified that: "I am not concerned about her personality or capabilities in the clinical setting. I was not concerned about her interactions with patients. To the extent that I was concerned, [it] was how other members of the team may perceive her based on my own experiences with her. One of the things I noticed about Sneha is that she talks fast, and always has, and what people think is frazzled is just what she comes off as, but it's just anxiety."

140.   GW is subject to the mandate of the ADA and receives federal financial assistance, as defined by 29 U.S.C. § 794, and, as such, may not discriminate against a person because of her disability.

141.   Ms. Iyer endured targeted hostility by GW while she was enrolled as a medical student at GW.

142.   The harassment Ms. Iyer faced was severe enough to alter the course of her education and create an abusive educational environment. Ms. Iyer faced harassment and abuse from GW faculty members Dean Davis and Dr. Gaba. This exacerbated Ms. Iyer's underlying condition, causing her to experience panic attacks. Furthermore, Ms. Iyer underwent tremendous stress whenever she was required to talk to Dean Davis and Dr. Gaba, and such communication was a non-negotiable necessity to her continued enrollment at GW.

143.   Ms. Iyer sought reprieve from the harassment and abuse she experienced by filing complaints against Dr. Gaba and Dean Davis per GW's Mistreatment Policy. Instead of GW helping Ms. Iyer and investigating her complaints, GW and its faculty retaliated against Ms. Iyer and dismissed her shortly thereafter when she was but four weeks away from graduation.

144.   GW knew about Dean Davis and Dr. Gaba's campaign of harassment against Ms. Iyer, as Ms. Iyer had filed complaints against both of them.

///

145.     Despite knowing about Ms. Iyer's issues with Dean Davis and Dr. Gaba, GW has failed to do anything to alleviate her distress and has not acted to prevent GW faculty from continuing to harass, retaliate, or discriminate against her.

146.     GW wrongly discriminated against Ms. Iyer, all in violation of her rights pursuant to the ADA and Section 504, inflicting mental and emotional distress, and resulting in mental and physical post-traumatic distress and causing further damage to her health, well-being, academic and professional careers.  GW was deliberately indifferent to Ms. Iyers harassment by GW faculty, all in violation of her rights pursuant to the ADA and Section 504, inflicting mental and emotional distress, resulting in mental and physical post-traumatic distress, and causing further damage to her health, well-being, academic and professional career, because she is disabled.

147.     As a direct and proximate result of GW's deliberate indifference to the harassment of Ms. Iyer in violation of the ADA and Section 504 by GW faculty, Ms. Iyer has suffered and continues to suffer damages academically, financially, and emotionally in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00).

148.     It has been necessary for Ms. Iyer to obtain the services of an attorney to prosecute this action, and Ms. Iyer is entitled to an award of attorney's fees and costs of suit incurred herein.

149.     Ms. Iyer is entitled to injunctive and declaratory relief to obtain readmission to GW's medical school free from retaliation, and for an order forbidding GW faculty from further perpetuating negative acts against her professionally, personally, academically, and from committing any other acts of discrimination.

///

## FOURTH CAUSE OF ACTION

### *BREACH OF CONTRACT*
**Against George Washington University School of Medicine and Health Sciences**

150.    Each of the allegations set forth in paragraphs 1 through 149, inclusive, are hereby incorporated by this reference as if realleged fully herein.

151.    Ms. Iyer has an express and implied contract with GW in connection with the rights explicitly guaranteed by the GW Student Handbook, school policies and other material provided by GW to students.

152.    GW's Student Handbook sets forth the GW "Mistreatment Policies and Procedures" with the following objectives:

> This Mistreatment Policy and related procedures ("Policy") are intended to inform members of the Medical School community about what constitutes learner mistreatment and what members can do should they encounter or observe it. In addition, the policy is intended to: (i) prohibit learner mistreatment by any employee of the George Washington University ("the University"), The George Washington University Hospital ("Hospital") or Medical Faculty Associates, Inc. ("MFA"), including, but not limited to, faculty members (pre-clinical and clinical), clerkship directors, attending physicians, fellows, residents, nurses and other staff, and classmates in the School community; (ii) encourage identification of learner mistreatment before it becomes severe or pervasive; (iii) identify accessible persons to whom learner mistreatment may be reported; (iv) require persons (whether faculty, staff or student) in supervisory or evaluative roles to report learner mistreatment complaints to appropriate officials; (v) prohibit retaliation against persons who bring learner mistreatment complaints; (vi) assure confidentiality to the full extent consistent with the need to resolve the matter appropriately; (vii) assure that allegations will be promptly, thoroughly, and impartially addressed; and (viii) provide for appropriate corrective action.

153.    GW's "Mistreatment Policies and Procedures" provide that GW is required to conduct a "Consultation Procedure" and then a "Formal Complaint Procedure" when a student files a complaint regarding mistreatment.

154.     GW breached its contract with Ms. Iyer by failing to investigate and take appropriate corrective action after Ms. Iyer first initiated a consultation procedure and then filed complaints against Dean Davis and Dr. Gaba.

155.     GW's Student Handbook also sets forth GW's "Non-Discrimination Policy" that provides as follows:

> The George Washington University does not unlawfully discriminate against any person on any basis prohibited by federal law, the District of Columbia Human Rights Act, or other applicable law, including without limitation, race, color, religion, sex, national origin, age, disability, veteran status, sexual orientation, or gender identity or expression. This policy covers all programs, services, policies, and procedures of the university, including admission to education programs and employment.

156.     GW breached its contract with Ms. Iyer when it failed to comply with its own "Non-Discrimination Policy" where faculty members discriminated against Ms. Iyer based on her religious affiliation when Jewish students were treated more favorably than Ms. Iyer, who is not Jewish, and afforded opportunities to make up missed clinical rotations and had failing evaluations changed to passing due to illness.

157.     GW also breached its contract with Ms. Iyer when it violated the policy pertaining to the GW Code of Honor and Professionalism that provides a process for reviewing allegations of unacceptable behavior.

158.     GW's process for reviewing allegations of unacceptable behavior involves a subcommittee that conducts information-gathering sessions with the accused students, during which a student may provide information and documentation to be reviewed.

159.     GW did not comply with this policy when the subcommittee chose not to evaluate the evidence Ms. Iyer provided in rebuttal to the allegations of professional misconduct she faced. Additionally, Ms. Iyer was not informed about Dr. Gaba's September 22,2022, or October 18,

2022, letters of concerns until weeks later late November/early December, despite GW policy requiring Ms. Iyer to have been informed earlier.

160.    As a direct and proximate result of GW's unlawful breaches, Ms. Iyer has suffered and continues to suffer irreparable harm, injury, and damages; including, but not limited to, monetary damages, time and resources, career opportunities and earning capacity, mental and emotional distress, anxiety and mental anguish, humiliation and embarrassment, and loss of personal and professional reputation, all in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00).

161.    It has been necessary for Ms. Iyer to obtain the services of an attorney to prosecute this action, and Ms. Iyer is entitled to an award of attorney's fees and costs of suit incurred herein.

162.    Ms. Iyer is entitled to injunctive and declaratory relief to obtain readmission to GW free from discrimination, and for an order forbidding GW from further perpetuating negative acts against her professionally, personally and academically, and from committing any other breach.

## FIFTH CAUSE OF ACTION

### *BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING*
**Against George Washington University School of Medicine and Health Sciences**

163.    Each of the allegations set forth in paragraphs 1 through 162, inclusive, are hereby incorporated by this reference as if realleged fully herein.

164.    District of Columbia law implies a covenant of good faith and fair dealing in all contracts between parties entered into in Washington D.C.

165.    Ms. Iyer and GW entered into and engaged in several contracts in relation to Ms. Iyer attending GW, and GW providing medical education and training.

///

166.    Ms. Iyer justifiably expected to receive certain benefits consistent with the agreements she entered into GW upon enrollment, including equal treatment on the basis of disability.

167.    Ms. Iyer adjusted her academic and personal decisions and behavior in relation to GW's contractual promises to provide her with a non-discriminatory, non-retaliatory, and non-hostile environment on the basis of her medical disability.

168.    Ms. Iyer performed her contractual obligations to GW by fulfilling the obligations expected of a medical student from GW.

169.    GW breached the covenant of good faith and fair dealing by discriminating and retaliating against Ms. Iyer repeatedly, as set forth in the general factual allegations detailed herein. GW's bad faith motivation for breaching the contracts was deliberate and were in conjunction with GW's ire at Ms. Iyer filing complaints against Dean Davis and Dr. Gaba.

170.    As a direct and proximate result of GW's unlawful breaches, Ms. Iyer has suffered, and continues to suffer, irreparable harm, injury, and damages; including, but not limited to, monetary damages, time and resources, career opportunities and earning capacity, mental and emotional distress, anxiety and mental anguish, humiliation and embarrassment; and loss of personal and professional reputation; all in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00).

171.    It has been necessary for Ms. Iyer to obtain the services of an attorney to prosecute this action, and Ms. Iyer is entitled to an award of attorney's fees and costs of suit incurred herein.

///

## SIXTH CAUSE OF ACTION

### *INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS*
**Against Dean Davis and Dr. Gaba**

172.    Each of the allegations set forth in paragraphs 1 through 171, inclusive, are hereby incorporated by this reference as if realleged fully herein.

173.    The Individuals Defendants acted, or failed to act, intentionally and recklessly, as described herein, and caused, and continue to cause, Ms. Iyer severe emotional distress.

174.    As described herein, the conduct of the Individual Defendants is extreme and outrageous, and caused, and continues to cause, Ms. Iyer severe emotional distress.

175.    Given the series of events Ms. Iyer has had to endure in conjunction with her enrollment in GW's medical school, the Individual Defendants intentionally inflicted emotional distress upon Ms. Iyer.

176.    The Individual Defendants and GW faculty coordinated an ongoing campaign against Ms. Iyer to punish her for filing complaints of harassment and abuse against the Individual Defendants.

177.    Defendant Dean Davis presided over a meeting where Ms. Iyer endured abuse and harassment from him when he swore at her, told her she was "fucking it up," he would be disappointed in her if he was her father, would not support her if she was his daughter, and her father is not proud of her.   He also sexually harassed Ms. Iyer by telling her she reminded him of his former girlfriend who made him unprofessional.

178.    Defendant Dr. Gaba filed a letter of concern against Ms. Iyer on October 18, 2022, in which Dr. Gaba included a long list of baseless allegations of misconduct by Ms. Iyer.  Ms. Iyer was not informed about Dr. Gaba's September 22, 2022, or October 18, 2022, letters of concern

///

until weeks later in late November/early December, despite GW policy requiring Ms. Iyer to have been informed earlier.

179.   During the time when Dr. Gaba submitted the letters of concern against Ms. Iyer, Dr. Gaba gave Ms. Iyer a passing evaluation – including a passing evaluation on Ms. Iyer's professionalism.  Dr. Gaba's letters of concern contradicted Dr. Gaba's simultaneous evaluation of Ms. Iyer.

180.   Even though Ms. Iyer submitted evidence to the Subcommittee at a hearing to rebut the unfounded allegations, the Subcommittee did not consider the evidence presented, and GW subsequently dismissed Ms. Iyer with just four weeks until her graduation.

181.   The Individual Defendants' actions were outrageous and intentional and done with malice and reckless disregard of the likelihood of causing Ms. Iyer to suffer severe emotional distress.  In doing the acts alleged, the Individuals Defendants acted knowingly, intentionally, and maliciously in total disregard for the effects of their actions upon Ms. Iyer.

182.   As a result of the Individual Defendants' intentional conduct and omissions, Ms. Iyer suffered, and continues to suffer, great mental and emotional harm, anguish, insecurity, self-revulsion, damage to her self-esteem and self-worth, shame and humiliation; including, but not limited to, depression and anxiety.

183.   As a direct and proximate result of the Individual Defendants' intentional conduct and omissions, Ms. Iyer has suffered, and continues to suffer, irreparable harm, injury, and damages; including, but not limited to, monetary damages, time and resources, career opportunities and earning capacity, mental and emotional distress, anxiety and mental anguish, humiliation and embarrassment; and loss of personal and professional reputation; all in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00).

///

184.    It has been necessary for Ms. Iyer to obtain the services of an attorney to prosecute this action, and Ms. Iyer is entitled to an award of attorney's fees and costs of suit incurred herein.

## DEMAND FOR JURY TRIAL

Ms. Iyer respectfully prays for trial by jury on all causes of action and claims with respect to which she has a right to jury trial.

## RELIEF REQUESTED

***WHEREFORE***, Plaintiff prays that this Honorable Court enter judgment in Ms. Iyer's favor, and against Defendants, for relief as follows:

1.    For general and compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00) to be determined at trial;

2.    For punitive damages against GW in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00) to be determined at trial;

3.    For injunctive and declaratory relief described herein, as the Court deems appropriate;

4.    For pre-judgment and post-judgment interest, as provided by law;

5.    For the costs and disbursements of this action, including experts, and such other attorneys' fees, pursuant to 42 U.S.C. § 1988, that justice so requires; and

///

6.      Such other and further legal and equitable relief as this Court deems necessary, just

and proper.

DATED this 12th day of January, 2024.

Respectfully Submitted,

**THE BACH LAW FIRM, LLC**

*/s/ Jason J. Bach*
Jason J. Bach
D.C. Bar No. 974126
7881 West Charleston Blvd., Suite 165
Las Vegas, Nevada 89117
Telephone: (702) 925-8787
Facsimile: (702) 925-8788
Email: jbach@bachlawfirm.com
*Attorney for Plaintiff Sneha Iyer*

## **VERIFICATION**

As to those allegations of facts not qualified by the phrase "upon information and belief" or otherwise, I do solemnly declare and affirm under penalties of perjury that the contents of the foregoing Complaint are true and accurate to the best of my knowledge.

_____
SNEHA IYER

Dated this $\underline{10^{th}}$ day of January, 2024.

35