**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

SNEHA IYER,

          *Plaintiff*,

    v.

GEORGE WASHINGTON UNIVERSITY
SCHOOL OF MEDICINE AND HEALTH
SCIENCES, *et al.*,

          *Defendants*.

Civil Action No. 24‑130 (SLS)

Judge Sparkle L. Sooknanan

██████████

## <u>MEMORANDUM OPINION</u>

Sneha Iyer was dismissed from medical school just four weeks before her graduation. The University cited unprofessional conduct as the reason for the dismissal. But Ms. Iyer argues that any unprofessional conduct was a product of her documented ███████████████, which are protected disabilities under the Americans with Disabilities Act (ADA) and the Rehabilitation Act. She has therefore sued the University for disability discrimination, retaliation, and harassment under the ADA and the Rehabilitation Act, as well as for breach of contract and breach of the covenant of good faith and fair dealing. She has also sued a dean and a clinical professor for the intentional infliction of emotional distress.

The Defendants have moved to dismiss the case for failure to state a claim upon which relief can be granted. Many of their arguments focus on factual disagreements better addressed at a later stage of these proceedings. The Court thus denies the Defendants' motion as to Ms. Iyer's discrimination and retaliation claims under the ADA and the Rehabilitation Act, as well as her breach-of-contract claim. But the Court dismisses the remaining claims under Federal Rule of Civil Procedure 12(b)(6).

## FACTUAL BACKGROUND

The Court draws the facts, accepted as true, from the Plaintiff's Amended Complaint. *Wright v. Eugene & Agnes E. Meyer Found.*, 68 F.4th 612, 619 (D.C. Cir. 2023).

Sneha Iyer enrolled as a medical student at George Washington University (GW) in the fall of 2018. First Am. Compl. (Am. Compl.) ¶ 10, ECF No. 13. And she thrived during her first two years. *See id.* ¶ 19. Not only did she earn respectable grades and avoid any disciplinary issues, but she also "excelled in her rotations" and received "outstanding letters of recommendation" from faculty members. *Id.* This all culminated in her passing the United States Medical Licensing Examination-Step 1. *Id.*

Her success continued for the next two years. She began her pediatrics and surgery rotations in June 2020, and both ended well. *Id.* ¶ 20. She then spent a year doing research before returning to her rotations in April 2022. *Id.* ¶¶ 21–22. And by July 2022, she had earned a passing grade in her psychiatry rotation and high passing grades in her anesthesia and dermatology rotations. *Id.* ¶¶ 22–23.

These accomplishments were not without setbacks. Ms. Iyer had ███████████ ███████████████████████████. *Id.* ¶ 24. And after working with a number of providers throughout the years, *id.*, she decided to register with the GW Disability Services Office in 2019, *id.* ¶ 16. This put the University, its administrators, and faculty "on notice that Ms. Iyer suffered from a disability and was entitled to academic accommodations." *Id.* ¶ 17.

Ms. Iyer continued to seek treatment while in medical school. ███████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

This brings us to Ms. Iyer's final year of school. She began her obstetrics/gynecology rotation in August 2022. *Id.* ¶ 28. The following month, she met with Advisory Dean Steven Davis. *Id.* ¶ 29. According to Ms. Iyer, he made several inappropriate comments during the meeting. *Id.* He said that she looked like "a former lover of his who had been a 'toxic' influence in his life, and he inquired about Ms. Iyer's relationship history and current status." *Id.* He then swore at Ms. Iyer and said that there was no way that her physician father was proud of her. *Id.* Around the same time, the preceptor of the obstetrics/gynecology rotation, Dr. Nancy Gaba, began to yell at Ms. Iyer and berated her in front of other staff. *Id.* ¶ 30. She also made negative comments about Ms. Iyer to other faculty members, and she contacted one of Ms. Iyer's medical providers and learned that Ms. Iyer ██████████████████. *Id.*

The obstetrics/gynecology rotation ended in October 2022. *Id.* ¶ 31. Ms. Iyer received a "passing evaluation from all three evaluators, including Dr. Gaba." *Id.* She also received no negative comments about her professionalism. *Id.*

Things took a turn for the worse in November 2022. ██████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████

On November 16, Dr. Gaba changed Ms. Iyer's obstetrics/gynecology rotation grade from passing to conditional. *Id.* ¶ 34. Dr. Gaba also reported some concerns about Ms. Iyer's professionalism to a superior, focusing on Ms. Iyer's absences and tardiness. *Id.* These concerns were relayed to the GW Subcommittee on Honor and Professionalism. *Id.* Meanwhile, "other similarly situated students who [were] not disabled" were treated "more favorably[.]" *Id.* ¶ 55(e). Namely, "GW faculty . . . allow[ed] those students to make up clinical rotations missed due to illness" and "chang[ed] their failing evaluations to passing, while Ms. Iyer was not afforded the same opportunities." *Id.*

On November 18, Ms. Iyer was scheduled to interview for a residency program. *Id.* ¶ 35. Dean Davis gave her an unplanned call before the interview began. *Id.* Ms. Iyer was already anxious about the interview and her recent grade change, so the added stress of the call triggered ███████████████████████████████████████ *Id.* She then wrote an email explaining why rescheduling the interview was necessary, but her explanation was inaccurate because of her ongoing ███████████████ . *Id.*

███████████████████████████████████████████████████████ ███████████████████████████████████████████ and she complained to GW's Subcommittee on Honor and Professionalism about her mistreatment by Dean Davis and Dr. Gaba, *id.* ¶ 37.

GW had previously provided Ms. Iyer with the "GW Student Handbook." *Id.* ¶ 11. The Handbook included a "Non-Discrimination Policy," which stated that GW "does not unlawfully discriminate against any person on any basis prohibited by federal law, the District of Columbia Human Rights Act, or other applicable law, including without limitation . . . disability[.]" *Id.* ¶ 13. This policy covered "all programs[,] services, policies, and procedures[.]"

*Id.* The Handbook also included "Mistreatment Policies and Procedures," which were "intended to inform members of the Medical School community about what constitutes learner mistreatment and what members can do should they encounter or observe it." *Id.* ¶ 12. They were also "intended to . . . prohibit learner mistreatment by any [GW] employee . . . including, but not limited to, faculty members (pre-clinical and clinical), clerkship directors, attending physicians, fellows, residents, nurses and other staff[.]" *Id.* The "Mistreatment Policies and Procedures" provided that "GW is required to conduct a 'Consultation Procedure' and then a 'Formal Complaint Procedure' when a student files a complaint regarding mistreatment." *Id.* ¶ 85.

But GW never initiated either procedure after Ms. Iyer complained. *Id.* ¶ 37. Instead, on February 9, 2023, the Subcommittee on Honor and Professionalism convened to consider concerns about Ms. Iyer. *Id.* ¶ 38. These concerns were raised by Dr. Gaba and others. *Id.* At the hearing, ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████

This was not enough for GW. On March 13, 2023, Ms. Iyer learned that the Subcommittee had recommended her dismissal from the school. *Id.* ¶ 41. And on April 12, just four weeks before graduation, she was dismissed from GW. *Id.* ¶ 43. This forced her to withdraw from the residency program with which she had been matched, losing the chance to earn a surgeon's salary. *Id.* ¶ 47.

## PROCEDURAL HISTORY

Ms. Iyer filed her Amended Complaint on April 23, 2024. *See* Am. Compl. Count 1 alleges that GW violated Title III of the ADA and Section 504 of the Rehabilitation Act of 1973 by discriminating against her because of her disability. *Id.* ¶¶ 49–59. Count 2 alleges that GW violated the ADA and Section 504 by retaliating against her for filing a complaint against Dean Davis and

Dr. Gaba. *Id.* ¶¶ 60–68. Count 3 alleges that GW violated the ADA and Section 504 by being "deliberately indifferent" to the harassment she had suffered at the hands of faculty. *Id.* ¶ 78; *see also id.* ¶¶ 69–81. Count 4 alleges that GW breached a contract by failing to follow the policies described in the Student Handbook. *Id.* ¶¶ 82–92. Count 5 alleges that GW breached the covenant of good faith and fair dealing when it breached the contract. *Id.* ¶¶ 93–101. And Count 6 alleges that Dean Davis and Dr. Gaba engaged in the intentional infliction of emotional distress when they harassed her and verbally abused her. *Id.* ¶¶ 102–107.

The Defendants filed their Motion to Dismiss on May 14, 2024. *See* Mot. Dismiss, ECF No. 15. They argue that all six claims should be dismissed under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief may be granted. *See id.* at 2. The motion has been fully briefed.

## LEGAL STANDARD

"A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests whether a complaint has properly stated a claim upon which relief may be granted." *Kursar v. Transp. Sec. Admin.*, 751 F. Supp. 2d 154, 163 (D.D.C. 2010). "In evaluating a motion under Rule 12(b)(6), the court must 'treat the complaint's factual allegations as true . . . and must grant [the] plaintiff the benefit of all inferences that can be derived from the facts alleged.'" *Donelson v. U.S. Bureau of Prisons*, 82 F. Supp. 3d 367, 370 (D.D.C. 2015) (quoting *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000) (cleaned up)). But the Court need not accept the plaintiff's "legal conclusions cast in the form of factual allegations." *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002) (cleaned up). "[T]he court 'may consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint[,] and matters of which . . .

judicial notice' may be taken." *Donelson*, 82 F. Supp. 3d at 371 (quoting *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997)).

## DISCUSSION

The Defendants argue that all six claims should be dismissed pursuant to Rule 12(b)(6). Mot. Dismiss at 13–30. But many of their arguments sound in fact. They deny that Dean Davis and Dr. Gaba ever engaged in inappropriate behavior, and they insist that Ms. Iyer was dismissed from GW because of her unprofessional conduct. *Id.* at 2–13. They even offer twenty-three exhibits to support their side of the story. *See* Mot. Dismiss, Exs. A–W, ECF Nos. 15-3–15-25. These sorts of factual arguments are best suited for a motion for summary judgment, not a motion to dismiss. Because the Court accepts the Plaintiff's allegations as true, it denies the Defendants' Motion to Dismiss as to Counts 1, 2, and 4.

But the Court dismisses the remaining three claims. First, the Court dismisses Count 3 because the Plaintiff lacks a private right of action to bring a harassment claim under the ADA and she has conceded her claim under Section 504 of the Rehabilitation Act. Second, the Court dismisses Count 5 because the Plaintiff's allegation of bad faith is too conclusory to support a claim that GW breached the covenant of good faith and fair dealing. And third, the Court dismisses Count 6 because the alleged harassment was not part of a pattern of harassment, so it does not amount to an intentional infliction of emotional distress.

### A.    Exclusion of Exhibits

As a threshold matter, the Court will address the twenty-three exhibits attached to the Defendants' Motion to Dismiss, including emails and text messages related to Ms. Iyer's dismissal from GW. *See* Mot. Dismiss, Exs. A–W. The Court will exclude all twenty-three exhibits at this stage of the litigation.

"In deciding a motion brought under Rule 12(b)(6), a court is restricted from considering matters outside the pleadings." *Hinton v. Corrections Corp. of America*, 624 F. Supp. 2d 45, 46 (D.D.C. 2009) (cleaned up); *see also* Fed. R. Civ. P. 12(d). A court may consider "the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, or documents upon which the plaintiff's complaint necessarily relies[,] even if the document is produced not by the plaintiff in the complaint but by the defendant in a motion to dismiss." *Hinton*, 624 F. Supp. at 46 (cleaned up).

The Defendants argue that Exhibits Q and W are incorporated by reference. First, they say that the Amended Complaint references Exhibit Q, which is the decision of the 2023 Subcommittee on Honor and Professionalism. Reply at 5, ECF No. 19 (citing Am. Compl. ¶¶ 37–41). Not so. The paragraphs cited by the Defendants merely discuss what occurred at the Subcommittee hearing and allege that Ms. Iyer "was informed that the Subcommittee recommended her dismissal from GW." Am. Compl. ¶ 41; *see also id.* ¶¶ 37–41. At no point do those paragraphs mention anything about a written decision. Second, the Defendants argue that the Amended Complaint references Exhibit W, which is the academic accommodation provided to Ms. Iyer after she registered her disability. *See* Reply at 5 (citing Am. Compl. ¶¶ 16–17). But this is not true either. The cited paragraphs simply say that Ms. Iyer registered her disability and put the University on notice that she "suffered from a disability and that she was entitled to academic accommodations." Am. Compl. ¶¶ 16–17. These paragraphs do not mention written evidence of an accommodation or even that Ms. Iyer received any accommodation in the first place.

The purported references to Exhibits Q and W are a far cry from the explicit citations that usually trigger the doctrine of incorporation by reference. *See, e.g.*, *Mason v. Am. Prospect, Inc.*, No. 23-cv-2238, 2024 WL 4345855, at *4 (D.D.C. Sept. 30, 2024) ("The *TAP* article—which is

the source of Dr. Mason's defamation claim—is extensively quoted from and referred to in the complaint."); *Barrett v. Atl. Monthly Grp. LLC*, No. 22-cv-49, 2024 WL 4119400, at *8 (D.D.C. Sept. 9, 2024) ("Barrett paraphrased the email chain in her complaint[.]"). And it is irrelevant that Plaintiffs failed to specifically enumerate Exhibits Q and W when objecting to incorporation. The Defendants argue that this failure amounts to a concession, rendering the two exhibits "properly before this Court and incorporated by reference." Reply at 2 n.1. But it cites no case to support this argument, and the Court is unaware of such an authority. *See generally* Laura Geary, *The Exception to Rule 12(d): Incorporation by Reference of Matters Outside the Pleadings*, 89 U. Chi. L. Rev. 979 (2022). The Court therefore concludes that Exhibits Q and W are not incorporated by reference.

The Defendants also argue that the Amended Complaint necessarily relies on their proffered exhibits. *See* Reply at 4–5. But the "prototypical" example of a necessary document is a contract in a claim for breach of contract. *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1133–34 (D.C. Cir. 2015). There, the document being incorporated "form[s] the basis for [the] claim[.]" *Id.* (cleaned up); *see also id.* at 1133 n.5 (collecting similar cases). The exhibits being offered by the Defendants, on the other hand, do not form the basis for any of Ms. Iyer's claims. The Defendants do not provide a copy of the Student Handbook, which would form the basis for the breach-of-contract claim. *See, e.g.*, *Hinton*, 624 F. Supp. 2d at 47. They instead present the Court with documents that form the "'who, what, where, when, and why' of Plaintiff's medical school experience and her dismissal from the program." Reply at 4. Considering these documents at this stage would therefore "blur the distinction between summary judgment and dismissal for failure to state a claim upon which relief could be granted." *Millers Cap. Ins., Co. v. Hydrofarm,*

*Inc.*, No. 21-cv-321, 2022 WL 1773610, at *4 (D.D.C. June 1, 2022) (quoting *Rose v. Bartle*, 871 F.2d 331, 340 n.3 (3d Cir. 1989)).

### B.    Discrimination

The Court now turns to the Plaintiff's claims in the Amended Complaint. Ms. Iyer first claims that GW discriminated against her because of her disabilities in violation of Title III of the ADA and Section 504 of the Rehabilitation Act. *See* Am. Compl. ¶¶ 49–59. Title III prohibits places of public accommodation from discriminating against an individual "on the basis of disability." 42 U.S.C. § 12182(a). And Section 504 bars recipients of federal funds from discriminating against an individual with a disability "solely by reason of her or his disability." 29 U.S.C. § 794(a). Ms. Iyer's claims survive the Defendants' motion.

"The ADA and Rehabilitation Act are 'virtually identical.'" *Wheeler v. Am. Univ.*, 619 F. Supp. 3d 1, 18 (D.D.C. 2022) (quoting *Harrison v. Rubin*, 174 F.3d 249, 253 (D.C. Cir. 1999)). The only difference is that "the ADA's causation standard is slightly less strict than the Rehabilitation Act's standard because [the ADA] does not require that the discrimination be 'solely' because of an individual's disability." *Id.* (cleaned up). "The upshot is that the analysis for these claims [is] essentially the same, save for a slight difference regarding causation." *Id.* at 18–19.

A plaintiff must plausibly allege three things to state a claim under the ADA or Section 504: "(1) that she is qualified under the Acts; (2) that she is excluded from participation in or has been denied the benefits, services, programs, or other activities for which the defendants are responsible or that she was otherwise discriminated against; and (3) the exclusion, denial, or discrimination was by reason of plaintiff's disability." *Id.* at 18 (cleaned up); *see also Reid-Witt v. District of Columbia*, 486 F. Supp. 3d 1, 7 (D.D.C. 2020); *Pierce v. District of Columbia*,

128 F. Supp. 3d 250, 267 (D.D.C. 2015). Looking at the Amended Complaint, Ms. Iyer has satisfied all three elements.[1]

The Defendants argue that plaintiffs must also allege that the defendant engaged in "bad faith or gross misjudgment." Mot. Dimiss at 17 (quoting *B.D. v. District of Columbia*, 66 F. Supp. 3d 75, 80 (D.D.C. 2014)). But this requirement applies only when plaintiffs are bringing a Section 504 claim alongside an Individuals with Disabilities Education Act (IDEA) claim. *See B.D.*, 66 F. Supp. 3d at 80 (saying it has been recognized "in the IDEA context"); *R.S. v. District of Columbia*, 292 F. Supp. 2d 23, 28 (D.D.C. 2003) (saying it applies "[i]n the context of handicapped children seeking IDEA benefits"); *Holmes-Ramsey v. District of Columbia*, 747 F. Supp. 2d 32, 38 (D.D.C. 2010) (saying it applies "in the context of an IDEA case"); *DL v. District of Columbia*, 109 F. Supp. 3d 12, 23–24 (D.D.C. 2015) (saying those who satisfy the requirement can "prevail under Section 504 for IDEA violations"); *Reid-Witt*, 486 F. Supp. 3d at 8 (calling it the "standard plaintiffs must meet to state a Rehabilitation Act claim in conjunction with an IDEA claim"). In the higher education context, where the IDEA does not apply, *Brown v. Tex. State Univ. Sys. Bd. of Regents*, No. 13-ca-483, 2013 WL 6532025, at *15 (W.D. Tex. Dec. 12, 2013), there is no such requirement. *See, e.g.*, *Di Lella v. Univ. of D.C. David A. Clarke Sch. of L.*, 570 F. Supp. 2d 1, 9 (D.D.C. 2008); *Wheeler*, 619 F. Supp. 3d at 18–21.

---

[1] At least for Section 504, the D.C. Circuit has listed a fourth element: "the program or activity is carried out by a federal executive agency or with federal funds." *Am. Council of the Blind v. Paulson*, 525 F.3d 1256, 1266 (D.C. Cir. 2008). Ms. Iyer satisfied this element by alleging that "GW . . . receives federal financial assistance, as defined by 29 U.S.C. § 749, including through the receipt of federal student aid funds[.]" Am. Compl. ¶ 53. Ms. Iyer also satisfactorily alleged facts supporting the conclusion that GW is a place of public accommodation under the ADA. She says that "GW is one of the premier medical schools in the country," *id.* ¶ 8, and any "place of education" counts as a place of public accommodation, 42 U.S.C. § 12181(7)(J). Title III therefore applies.

### 1.    Disability Status

To start, plaintiffs must have a disability to bring claims under the ADA and Section 504. *See* 42 U.S.C. § 12182(a); 29 U.S.C. § 794(a); *see also Singh v. George Washington Univ. Sch. of Med. and Health Scis.*, 597 F. Supp. 2d 89, 94 (D.D.C. 2009) (using this as the first element). And both statutes use the same definition of "disability." *See Humphries v. Newman*, No. 18-cv-2936, 2022 WL 612657, *5 (D.D.C. Mar. 2, 2022); *see also* 29 U.S.C. § 705(9)(B) (incorporating definitions from 42 U.S.C. § 12102). This is why "cases interpreting the ADA are equally applicable when analyzing a claim under the Rehabilitation Act." *Badwal v. Bd. of Trs. of Univ. of D.C.*, 139 F. Supp. 3d 295, 308 (D.D.C. 2015) (citations omitted).

"A plaintiff has a disability if he or she (1) suffers from an impairment, (2) the impairment limits an activity that constitutes a major life activity, and (3) the limitation is substantial." *Id.* (citation omitted). This should be "construed in favor of broad coverage" of individuals. *Id.* (quoting 42 U.S.C. § 12102(4)(A)). The Amended Complaint sufficiently alleges all three facts.

*First*, Ms. Iyer alleges that she suffers from several impairments, including ███████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████

*Second*, Ms. Iyer claims that her impairments limit major life activities. She specifically says that ████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

███████████████████████████████████████████████████

map well onto two major life activities identified by Congress: █████████████████████

*See* 42 U.S.C. § 12102(2)(A).

The Defendants do not address these symptoms. *See* Mot. Dismiss at 15–16. They instead

focus on a single allegation in the Amended Complaint about Ms. Iyer writing an inaccurate

explanation for why she needed to reschedule her residency interview. *See id.* Ms. Iyer says that

she wrote incorrect information because of her █████████████████████████████

███████████████████████████████. Am. Compl. ¶ 35. The Defendants

question how her symptoms could have "caused her to lie," Mot. Dismiss at 15, but this misses the

forest for the trees: Ms. Iyer repeatedly alleges plenty of other ways that her symptoms negatively

impacted her performance. *See, e.g.*, Am. Compl. ¶¶ 26 ████████████████████

█████████████████████████████████, 32 █████████████████

█████████████████████████████████ 34 ("She also

reported concerns . . . focused principally upon Ms. Iyer's absences and lateness during her

rotation."), 39 ████████████████████████████████████████

████████████████████████████.

*Third*, Ms. Iyer alleges that the limitation is substantial. Most glaringly, ████████████

███████████████████████████████████████████████████

███████████████████████████. *See* Am. Compl. ¶¶ 36, 33.

This provides a useful window into the nature of her limitations because courts are supposed to

assess them "without regard to the ameliorative effects of mitigating measures such as . . .

medication[.]" 42 U.S.C. § 12102(4)(E)(i)(I). The test for whether a limitation is substantial

ultimately turns on how her abilities to perform the major life activity compares with that of "most

people in the general population." *Badwal*, 139 F. Supp. 3d at 310 (cleaned up). It would be hard to argue that ████████████████████████████████████████. Ms. Iyer therefore alleged sufficient facts to support the conclusion that she suffers from a disability under the terms of the ADA and Section 504.

The Defendants argue that any limitations must not have been substantial since Ms. Iyer "alleges that she consistently excelled academically." Mot. Dismiss at 15 (citing Am. Compl. ¶¶ 8, 9, 18–20, 22, 23, 40, 44). They cite *Singh v. George Washington University School of Medicine and Health Sciences*, 597 F. Supp. 2d 89 (2009), for the proposition that longstanding academic success is inconsistent with a disability that limits one's ability to learn and succeed in medical school. Mot. Dismiss at 16. In *Singh*, the court looked at all of the evidence presented at a bench trial, including evidence of prior academic success, and concluded that the plaintiff's reading disability must not have substantially limited her performance on medical school exams as she had alleged. *See* 597 F. Supp. 2d at 95–96. But there are two problems with this argument. First, *Singh* reached its conclusion only after a trial, and it never said that academic success always forecloses disability status as a matter of law. *See id.* Second, the plaintiff in *Singh* had claimed that her reading disability substantially limited her academic performance at medical school, so her prior academic success was highly relevant. *See id.* But Ms. Iyer does not allege any academic limitations; to the contrary, she asserts that she "earned respectable grades." Am. Compl. ¶ 18. She instead claims that her disabilities caused her alleged "unprofessional conduct." *Id.* ¶ 39. And even those with academic prowess may sometimes struggle with professionalism.

### 2. Discriminatory Acts

The second element of an ADA or Section 504 claim requires plaintiffs to allege that they were "excluded from participation in or [were] denied the benefits, services, programs, or other

activities for which the defendants are responsible or that [they were] otherwise discriminated against." *See Wheeler*, 619 F. Supp. 3d at 18 (cleaned up). Ms. Iyer lists several allegedly discriminatory acts in her Amended Complaint that satisfy this element. *See* Am. Compl. ¶ 55. Two noteworthy ones are that she was "dismissed . . . from the medical school based solely on conduct attributable to her disabilities," and that she was "denied . . . the benefit of graduating with an M.D. degree, despite [having met] all the minimum requirements established by GW for graduation with an M.D. degree." *Id.* This latter allegation in particular makes clear that GW was responsible for administering the benefit of a diploma.

According to the Defendants, the alleged facts show that Ms. Iyer is not qualified to earn a medical degree. *See* Mot. Dismiss at 16–17. More specifically, they argue that providing a degree to someone with the professionalism issues identified in the Amended Complaint would "fundamentally alter the nature of earning a medical degree and undermine GW's discretion in awarding medical degrees." *Id.* at 16. The Supreme Court has recognized that grantees covered by the Rehabilitation Act need not make "fundamental" modifications to accommodate those with disabilities. *Alexander v. Choate*, 469 U.S. 287, 300 (1985). And the text of the ADA makes plain that the failure to make a reasonable accommodation counts as discrimination "unless the entity can demonstrate that making such modifications would fundamentally alter the nature of [the] goods, services, facilities, privileges, advantages, or accommodations." 42 U.S.C. § 12182(b)(2)(A)(ii). But as should be clear from the text, "the burden of proving a fundamental alteration rests with the defendant." *Long v. Howard Univ.*, 439 F. Supp. 2d 68, 78 (D.D.C. 2006). For this reason, "'[t]he determination of whether a particular modification is "reasonable" involves a fact-specific, case-by-case inquiry' that typically requires jury resolution." *Id.* at 76 (quoting *Staron v. McDonald's Corp.*, 51 F.3d 353, 356 (2d Cir. 1995)). The Defendants are

therefore hard-pressed to make this argument at the motion-to-dismiss stage. *See, e.g.*, *Equal Rights Ctr. v. Uber Techs., Inc.*, 525 F. Supp. 3d 62, 89 (D.D.C. 2021) (denying a motion to dismiss a Title III claim in part because the question of whether a modification would "fundamentally alter" the nature of the service "will likely be the nub of the dispute at subsequent stages of this case" (citing *Di Lella*, 570 F. Supp. 2d at 8)).

Ms. Iyer alleges sufficient facts to support the conclusion that she would not have struggled with professionalism moving forward. For example, she states that during her first two years of medical school, she "never faced any disciplinary or professionalism problems," Am. Compl. ¶ 18, and she "receiv[ed] outstanding letters of recommendation from GW faculty members," *id.* ¶ 19. And even after ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████ *Id.* ¶ 27. A plausible reading of the Amended Complaint suggests that ███████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ██████ A jury may well find that Ms. Iyer was well equipped to "function in high stress, high stakes environments where decisions and guidance must be made quickly, accurately, and honestly." Mot Dismiss at 17.

### 3.    Causation

The third element requires plaintiffs to allege that their "exclusion, denial, or discrimination was by reason of [their] disability." *Wheeler*, 619 F. Supp. 3d at 18. Remember that "the ADA's causation standard 'is slightly less strict than the Rehabilitation Act's standard because [the ADA] does not require that the discrimination be "solely" because of' an individual's

disability." *Id.* (quoting *Reid-Witt*, 486 F. Supp. 3d at 10–11). The Court will therefore focus on the more stringent Rehabilitation Act standard.

Courts in this District routinely apply but-for causation in Rehabilitation Act cases. *See, e.g.*, *Montgomery v. McDonough*, 682 F. Supp. 3d 1, 15 (D.D.C. 2023); *Williams v. Donovan*, 219 F. Supp. 3d 167, 173–74 (D.D.C. 2016); *Drasek v. Burwell*, 121 F. Supp. 3d 143, 154 (D.D.C. 2015); *Gard v. U.S. Dep't of Educ.*, 752 F. Supp. 2d 30, 35–36 (D.D.C. 2010), *aff'd*, No. 11-5020, 2011 WL 2148585 (D.C. Cir. May 25, 2011); *Hollingsworth v. Vilsack*, No. 23-cv-2427, 2024 WL 4332118, at *10 (D.D.C. Sept. 27, 2024); *Zano v. McDonough*, No. 22-cv-2748, 2024 WL 2699976, at *11 (D.D.C. May 24, 2024). This case is no different. Section 504 prohibits discriminatory conduct engaged in "solely by reason of" an individual's disability. 29 U.S.C. § 794(a). And "[f]or Rehabilitation Act claims, courts have found the presence of the word 'solely' means that the causation element of intentional discrimination and retaliation claims brought under that Act cannot be satisfied by a motivating factor test; rather, the applicable analysis is the traditional 'but-for' causation standard." *Drasek*, 121 F. Supp. 3d at 154 (collecting cases).

Courts have elaborated on this standard in the employment-discrimination context by saying a plaintiff can satisfy her burden "by showing 'that she was treated differently from similarly situated employees who are not part of the protected class.'" *Hollingsworth*, 2024 WL 4332118, at *10 (quoting *Brown v. Sessoms*, 774 F.3d 1016, 1022 (D.C. Cir. 2014) (cleaned up)). And they look for something similar when a student brings a Section 504 claim against her school. *See, e.g.*, *B.D.*, 66 F. Supp. 3d at 80 (plaintiffs failed to allege causation because they "fail[ed] to allege any facts regarding how B.D. was allegedly treated differently from any of his similarly situated peers"); *Jackson v. District of Columbia*, 826 F. Supp. 2d 109, 122–23

(D.D.C. 2011) (plaintiffs failed to allege causation because they "did not allege that AJP was treated differently from non-disabled students"), *aff'd sub nom*, *Jackson v. Henderson*, No. 11-7156, 2013 WL 500809 (D.C. Cir. Jan. 18, 2013); *Di Lella*, 570 F. Supp. 2d at 9 (plaintiff failed to allege causation because his "complaint simply does not offer any plausible explanation for how she was treated *differently* on the basis of her disability" (emphasis added)).

Ms. Iyer claims that "GW faculty treated other similarly situated students who are not disabled more favorably and differently than Ms. Iyer by allowing those students to make up clinical rotations missed due to illness, and by changing their failing evaluations to passing, while [she] was not afforded the same opportunities." Am. Compl. ¶ 55(e). This is a detailed allegation that could plausibly establish causation if ultimately shown to be true.

The Defendants' counterarguments are unconvincing. First, they say that this allegation is an "unsupported statement relating to unspecified other students or their individual situations[.]" Mot. Dismiss at 20. But unsupported allegations are sufficient to survive a motion to dismiss. *See Donelson*, 82 F. Supp. 3d at 370 (courts must treat factual allegations as true when evaluating a motion to dismiss under Rule 12(b)(6)). And there is no bright-line rule requiring individuals to be identified by name. *See, e.g.*, *Johnson v. District of Columbia*, 572 F. Supp. 2d 94, 101, 112 (D.D.C. 2008) (denying a motion to dismiss ADA and Rehabilitation Act claims); *see also* Second Am. Compl. ¶ 81, *Johnson v. District of Columbia*, 572 F. Supp. 2d 94 (D.D.C. 2008) (No. 07-cv-1033), ECF No. 15 ("Plaintiff is being paid less than those similarly qualified and non-disabled employees holding positions requiring similar skills, responsibilities and efforts."). Ms. Iyer's allegation is not a threadbare recital of the proposition that similarly situated individuals were treated better than she was. *See, e.g.*, *Harris v. Mayorkas*, No. 21-cv-1083, 2022 WL 3452316, at *6 (D.D.C. Aug. 18, 2022) (dismissing Title VII claim where the plaintiff merely

alleged that "[s]imilarly situated co-workers outside of [her] race were not treated in the manner in which [she] was" (cleaned up)); *see also Hollingsworth*, 2024 WL 4332118, at *10 (treating the causation analysis for Title VII and the Rehabilitation Act as co-extensive). Rather, it states that individuals who had similarly failed or missed rotations due to illness were able to make up those rotations and change their evaluations to passing. *See* Am. Compl. ¶ 55(e). This is enough to survive a motion to dismiss. *See, e.g.*, *Johnson*, 572 F. Supp. 2d at 101.

Second, the Defendants argue that "other students making up missed clinical rotations due to illness and/or changing evaluation scores for them has no bearing on Plaintiff's alleged disabilities of ███████████████████████████████." Mot. Dismiss at 20. The Court struggles to understand the thrust of this argument. Ms. Iyer's allegation says nothing about these other students' experiences bearing on her ████████████; it merely alleges that other students were allowed to make up rotations that they missed due to illness and to change their failing evaluations to passing, while Ms. Iyer was not afforded the same opportunities. *See* Am. Compl. ¶ 55(e).

### C.    Retaliation

Turning to Ms. Iyer's retaliation claim, she argues that GW engaged in retaliation in violation of the ADA and Section 504. *See* Am. Compl. ¶¶ 60–68. "To prevail on a retaliation claim under both the ADA and Section 504 . . . , the plaintiff must show (1) she engaged in a protected activity, (2) the defendant took a materially adverse action against her, and (3) there was a causal connection between the protected activity and the adverse action." *Shinabargar v. Bd. of Trs. of Univ. of D.C.*, 164 F. Supp. 3d 1, 16 (D.D.C. 2016) (cleaned up). This claim, too, survives the Defendants' motion.

The first two elements are easily satisfied. First, Ms. Iyer alleges that she "engaged in protected activity; including, but not limited to, when she filed complaints against Dr. Gaba and

Dean Davis for their mistreatment and abuse towards her that exacerbated her ███████." Am. Compl. ¶ 62. And second, she alleges that she was "subjected to an adverse action when, shortly after she filed complaints against Dean Davis and Dr. Gaba, GW dismissed Ms. Iyer from the medical school." Am. Compl. ¶ 63(b). Even the Defendants appear to acknowledge that "dismissal may be an adverse action." Mot. Dismiss at 22.

And the third element is satisfied, too. Ms. Iyer alleges that she "complained to GW's Subcommittee on Honor and Professionalism about her mistreatment by Advisory Dean Davis and Dr. Gaba." Am. Compl. ¶ 37. Then she alleges that the same Subcommittee "recommended her dismissal from GW." *Id.* ¶ 42. This is not a case where the decisionmaker had no knowledge that she was engaging in protected activity. *See Shinabargar*, 164 F. Supp. 3d at 17. Also, "the events happened closely together," Am. Compl. ¶ 64, and "[t]emporal proximity can indeed support an inference of causation," *Woodruff v. Peters*, 482 F.3d 521, 529 (D.C. Cir. 2007).

The Defendants argue that there is no causal link because Ms. Iyer does not allege that "any complaints she filed against Dean Davis and Dr. Gaba pre-dated their Letters of Concern which initiated the Subcommittee hearing." Mot. Dismiss at 21–22. But Ms. Iyer does not claim that those letters were the relevant adverse actions. *See* Am. Compl. ¶ 63. She instead claims that her *dismissal* was an adverse action, and she *does* allege that this occurred "shortly after she filed [her] complaints." Am. Compl. ¶ 63(b). The Defendants also state that Ms. Iyer failed to allege that "the Subcommittee was ever aware of any formal complaints against Dr. Gaba and Dean Davis." Mot. Dismiss at 22. But she sufficiently alleged that she "complained *to* GW's Subcommittee on Honor and Professionalism about her mistreatment by Advisory Dean Davis and Dr. Gaba," Am. Compl. ¶ 37 (emphasis added), so knowledge can be inferred.

### D.     Harassment

Ms. Iyer's third claim is not a model of clarity. Without citing any specific statutory provision, she says that GW violated the ADA and Section 504 by being "deliberately indifferent to [her] harassment by GW faculty." Am. Compl. ¶ 78; *see also id.* ¶¶ 69–81. The Court's most charitable read is that she is making two different arguments under the two different statutes.

*First*, Ms. Iyer appears to be arguing that GW violated the ADA by subjecting her to a hostile work environment. *See* Opp'n at 12, ECF No. 18. Courts in this District have repeatedly said that "a plaintiff who alleges that his employer intentionally created a pervasively hostile work environment because of the employee's disability states a cause of action for intentional discrimination under the ADA." *Johnson v. Billington*, 404 F. Supp. 2d 157, 169 (D.D.C. 2005); *see also id.* (collecting cases "recogniz[ing] an ADA hostile work environment claim"). One reason courts recognize this cause of action under the ADA is because the statutory text so closely mirrors that of Title VII, which contains a cause of action for hostile work environment harassment. *See, e.g.*, *Fox v. Gen'l Motors Corp.*, 247 F.3d 169, 176 (4th Cir. 2001). But Ms. Iyer does not claim to be employed by GW; she only claims to be a medical student at the University. *See* Am. Compl. ¶ 10. And at least in the Title VII context, medical students are not treated as employees. *See Hajjar-Nejad v. George Washington Univ.*, 873 F. Supp. 2d 1, 14 (D.D.C. 2012). The Court sees no reason why this would be any different in the ADA context.

*Second*, Ms. Iyer originally alleged that GW violated Section 504 and the ADA through its indifference toward her harassment. *See* Am. Compl. ¶ 78. But she has since conceded that she lacks a cause of action to pursue this claim. This is because the Defendants argued in their Motion to Dismiss that the "Plaintiff's disability harassment claim is not covered by the Rehabilitation Act." Mot. Dismiss at 23 (citing *Lee as Friends of M.L. v. Seed Pub. Charter Sch. of Washington,*

*D.C.*, No. 18-cv-2786, 2019 WL 4469285, at *7 (D.D.C. Sept. 18, 2019) (recognizing a Section 504 cause of action only for peer-on-peer harassment, not teacher-student harassment)). And they said there was "no authority to support a cause of action for disability harassment" under the ADA separate from "a hostile work environment claim." *Id.* Ms. Iyer responded by insisting that she satisfied the elements of a hostile work environment claim under the ADA, without mentioning Section 504 or any alternative cause of action under the ADA. *See* Opp'n at 12–13. "It is well understood in this Circuit that when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded." *Hopkins v. Women's Div., Gen. Bd. of Glob. Ministries*, 284 F. Supp. 2d 15, 25 (D.D.C. 2003) (citations omitted), *aff'd*, 98 F. App'x 8 (D.C. Cir. 2004). This includes the argument that a plaintiff lacks a cause of action. *See, e.g.*, *Woodruff v. Peters*, No. 05-cv-2071, 2007 WL 1378486, at *6 (D.D.C. May 9, 2007). Ms. Iyer therefore fails to state a harassment claim under Section 504 or the ADA.[2]

---

[2] The Defendants argue that Section 504 protects only against "disability-based harassment by other students." Mot. Dismiss at 23. It is true that courts in this District recognizing a cause of action for harassment under Section 504 have discussed only peer-on-peer harassment. *See, e.g.*, *Lee*, 2019 WL 4469285, at *7. But the Court sees no reason why the logic underlying those opinions would not apply with equal force to teacher-student harassment.

The opinions recognizing that Section 504 protects against peer-on-peer harassment rely on *Davis v. Monroe County Board of Education*, 526 U.S. 629 (1999). There, the Supreme Court held that Title IX allows plaintiffs to hold schools liable for peer-on-peer harassment. *See id.* at 633. Many circuits have extended this to Section 504 because the two statutes are both Spending Clause statutes with "strikingly similar" operative language. *S.B. ex rel. A.L. v. Bd. of Educ. of Harford Cnty.*, 819 F.3d 69, 75 (4th Cir. 2016). But Title IX also creates a private right of action for teacher-student harassment. *See Franklin v. Gwinnett Cnty. Pub. Schs.*, 503 U.S. 60, 74–75 (1992); *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 281 (1998). In fact, *Davis* even recognized that Title IX can be breached more easily by teacher-student harassment than by peer-on-peer harassment given the former's "systemic effect on a program or activity." 526 U.S. at 653. So to the extent Section 504's right of action for peer-on-peer harassment relies on similarities to Title IX, the Court sees no reason why it would not also protect against teacher-student harassment.

E.      **Breach of Contract**

Ms. Iyer next alleges breach of contract against GW. *See* Am. Compl. ¶¶ 82–92. The Court has diversity jurisdiction over this claim because Ms. Iyer is a citizen of Pennsylvania, Am. Compl. ¶ 1, and GW has its principal place of business in the District of Columbia, *id.* ¶ 2. *See* 28 U.S.C. § 1332. So the Court follows District of Columbia's choice-of-law rules. *See Mosby-Nickens v. Howard Univ.*, 864 F. Supp. 2d 93, 99 n.2 (D.D.C. 2012).

The District of Columbia choice-of-law rules require the Court to consider "the governmental policies underlying the applicable laws and [to] determine[] which jurisdiction's policy would be the most advanced by the application of its law to the facts of the case[.]" *Radosti v. Envision EMI, LLC*, 717 F. Supp. 2d 37, 59 (D.D.C. 2010) (citations omitted). The factors to consider are "(1) the place where the injury occurred; (2) the place where the conduct causing the injury occurred; (3) the domicile, residence, nationality, place of incorporation and place of business of the parties; and (4) the place where the relationship is centered." *Id.* (citations omitted). The Court will apply District of Columbia law because GW is based in the District and all of the conduct at issue took place in the District. *See, e.g.*, *Mosby-Nickens*, 864 F. Supp. 2d at 99 n.2.

Under District of Columbia law, plaintiffs bringing a breach-of-contract claim must allege "(1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by the breach." *Inst. of Multidimensional Med. v. Metagenics, Inc.*, 635 F. Supp. 3d 6, 13 (D.D.C. 2022) (cleaned up); *see also Tsintolas Realty Co. v. Mendez*, 984 A.2d 181, 187 (D.C. 2009). The Amended Complaint alleges all four elements.

1.      **Contract Existence**

"Under D.C. law, generally speaking, 'the relationship between a university and its students is contractual in nature.'" *Doe v. Am. Univ.*, No. 19-cv-3097, 2020 WL 5593909, *11 (D.D.C. Sept. 18, 2020) (quoting *Basch v. George Washington Univ.*, 370 A.2d 1364, 1366 (D.C. 1977)); *accord Chenari v. George Washington Univ.*, 847 F.3d 740, 744 (D.C. Cir. 2017) ("[T]he relationship between a university and its students is contractual in nature." (quoting *Manago v. District of Columbia*, 934 A.2d 925, 927 (D.C. 2007) (cleaned up)). "Whether a specific university policy gives rise to contractual rights, the D.C. Court of Appeals has held, 'depend[s] upon general principles of contract construction.'" *Doe*, 2020 WL 5593909, at *11 (quoting *Basch*, 370 A.2d at 1367).

"A contract is valid only where there is 'both (1) agreement as to all material terms and (2) intention of the parties to be bound.'" *Mosby-Nickens*, 864 F. Supp. 2d at 99 (quoting *Jack Baker, Inc. v. Off. Space Dev. Corp.*, 664 A.2d 1236, 1238 (D.C. 1995)). When deciding if a university policy satisfies these requirements, the document "must be viewed as a whole and the court should view the language of the document as would a reasonable person in the position of the parties." *Pride v. Howard Univ.*, 384 A.2d 31, 34 (D.C. 1978) (cleaned up).

The Defendants argue that student handbooks do not create a valid contractual relationship between a student and a university. Ms. Iyer counters that three portions of GW's Student Handbook demonstrate an intent to be bound. The Court finds that one of the three passages is sufficient to allege a plausible breach-of-contract claim, so this claim survives.

*First*, Ms. Iyer alleges that GW's "Mistreatment Policies and Procedures" are "intended to . . . prohibit learner mistreatment by any employee of the George Washington University, . . . including, but not limited to, faculty members (pre-clinical and clinical)[.]"

Am. Compl. ¶ 84; *see also id.* (prohibiting "retaliation against persons who bring learner mistreatment complaints"). At first this language looks promising. It prohibits certain conduct by university employees, and at least one court in this District has said that policy language binding employees counts as an indication of a willingness to be bound. *See Doe*, 2020 WL 5593909, at *12 ("The Policy imposes certain obligations on . . . American University community members[.]"). But the Court "is not aware of [a case] where a court has construed a university code of conduct's prohibition of certain conduct as a promise to extinguish all such conduct or to investigate all instances of reported prohibited conduct." *Stafford v. George Washington Univ.*, No. 18-cv-2789, 2019 WL 13160063, at *4 (D.D.C. Sept. 17, 2019). So this language does not demonstrate an intent to be bound.

*Second*, Ms. Iyer alleges that GW's "Non-Discrimination Policy" provides that "[t]he George Washington University does not unlawfully discriminate against any person on any basis prohibited by federal law." Am. Compl. ¶ 87. It also says that it "covers all programs, services, policies, and procedures of the university, including admission to education programs and employment." *Id.* Again, this language initially looks good. When a court in this District was faced with a similar policy, it found that the language clarifying the policy's wide scope indicated an intent to be bound. *See Doe*, 2020 WL 5593909, at *11–12 ("This policy applies to all University programs and activities."). But GW's Non-Discrimination Policy just says it will abide by the law, and "promise[s] to perform . . . pre-existing legal obligation[s] . . . do[] not create mutuality of obligation and cannot give rise to an enforceable contract." *Stafford*, 2019 WL 13160063, at *2 (quoting *Di Lella*, 570 F. Supp. 2d at 11 (citations omitted)). The language therefore does not establish an enforceable contract.

*Third*, Ms. Iyer alleges that GW's "'Mistreatment Policies and Procedures' provide that GW is required to conduct a 'Consultation Procedure' and then a 'Formal Complaint Procedure' when a student files a complaint regarding mistreatment." Am. Compl. ¶ 85. This fits the bill for a breach-of-contract claim. "Indeed, the courts that have construed a university's code of conduct as a contract have enforced only the sections in which the school committed to follow specific disciplinary procedures." *Stafford*, 2019 WL 13160063, at *4 (citing *Doe*, 321 F. Supp. 3d at 124; *Pride*, 834 A.2d at 35). It is true that courts often have more of the operative text to rely on when making these decisions. *See, e.g.*, *Doe*, 2020 WL 5593909. But a "[c]ontract claim will not be dismissed for failure to attach the contract to the complaint." *Smith v. Wash. Post Co.*, 962 F. Supp. 2d 79, 86–87 (D.D.C. 2013) (quoting 2 James Wm. Moore et al., Moore's Federal Practice, ¶ 10.05[4] (3d ed. 1999); *see also McDowell v. CGI Fed. Inc.*, No. 15-cv-1157, 2017 WL 2392423, at *7 (D.D.C. June 1, 2017) (the "liberal pleading standard" counsels against dismissal when the contract was "not before the Court in its entirety"). Ms. Iyer therefore sufficiently alleges the existence of a contract.

### 2.    Duty, Breach, and Damages

The Plaintiff also alleges the final three elements necessary to state a breach-of-contract claim. First, she identified an obligation or duty arising out of the contract when she said that the Mistreatment Policies and Procedures "required" GW university to conduct a Consultation Procedure and a Formal Complaint Procedure after a complaint has been filed. Am. Compl. ¶ 85. Second, she alleged that GW breached that obligation by failing to initiate those procedures after she filed her complaint about mistreatment by Dean Davis and Dr. Gaba. *See id.* ¶ 86. And third, she claimed damages when she said that she "has suffered and continues to suffer irreparable harm,

injury, and damages," listing several discrete harms. *Id.* ¶ 90. The Court therefore declines to dismiss her breach-of-contract claim.

The Defendants argue that "[e]ven if [the] Plaintiff could sufficiently allege the existence of a valid contract, her breach of contract claim fails because GW provided a rational basis for her dismissal." Mot. Dismiss at 26. They cite *Chenari v. George Washington University*, 847 F.3d 740 (D.C. Cir. 2017), for the proposition that "a breach of contract claim will fail unless there is some allegation or evidence to conclude that there was no rational basis for the [school's determination of educational or professional inadequacy] or that it was motivated by fad faith or ill will unrelated to academic performance." Mot. Dismiss at 26. But there are two problems with this argument.

*First*, the rule requiring evidence that there was no rational basis for dismissal applies at the summary judgment stage. *See Chenari*, 847 F.3d at 745 ("A university 'will be entitled to *summary judgment* unless the plaintiff can provide some evidence from which a fact finder could conclude that there was no rational basis for the decision or that it was motivated by bad faith or ill will unrelated to academic performance.'" (emphasis added) (quoting *Alden v. Georgetown Univ.*, 734 A.2d 1103, 1108 (D.C. 1999))); *see, e.g.*, *Smith v. Howard Univ.*, No. 21-cv-920, 2024 WL 1831955, at *4 (D.D.C. Mar. 21, 2024); *Bain v. Howard Univ.*, 968 F. Supp. 2d 294, 297–302 (D.D.C. 2013). At the motion-to-dismiss stage, plaintiffs may allege facts, "which *must* be taken as true," that may prevent courts "from concluding that there was a discernable, rational academic basis for . . . failing grades and [a] subsequent dismissal[.]" *Paulin v. George Washington Univ. Sch. of Med. & Health Scis.*, 878 F. Supp. 2d 241, 247 (D.D.C. 2012) (cleaned up). Ms. Iyer alleges that she initially "received a passing evaluation from all three evaluators, including Dr. Gaba," at the end of her obstetrics/gynecology rotation. Am. Compl. ¶ 31. She also alleges that "[t]here were no negative remarks concerning [her] professionalism" at the time. *Id.* This calls

into question whether Dr. Gaba had a rational basis for changing Ms. Iyer's grade to conditional and for filing concerns about her professionalism over a month after the rotation ended, *see id.* ¶ 34—concerns considered by the Subcommittee on Honor and Professionalism, *id.* ¶ 38.

*Second*, Ms. Iyer's breach-of-contract claim is not premised on her dismissal. The only alleged portion of the Student Handbook that showed an intent to be bound was that which guaranteed certain procedures following complaints of mistreatment. *See supra*, at 24–26. Her claim is therefore premised on GW's failure to initiate those procedures. *See* Am. Compl. ¶ 37. So "the case law requiring a university to show only a rational basis for its dismissal decision is an awkward fit with this case." *Freeman*, 2022 WL 4289640, at *3.

### F.     Breach of the Covenant of Good Faith and Fair Dealing

In addition to her breach-of-contract claim, Ms. Iyer brings a claim for breach of the covenant of good faith and fair dealing. *See* Am. Compl. ¶¶ 93–101. Under District of Columbia law, "[a]ll contracts 'contain an implied duty of good faith and fair dealing, which means that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" *Paulin*, 878 F. Supp. 2d at 247 (quoting *Allworth v. Howard Univ.*, 890 A.2d 194, 201 (D.C. 2006) (cleaned up)). "A party breaches this duty by evading the spirit of the contract, willfully rendering imperfect performance, or interfering with performance by the other party." *Id.* at 247–48 (cleaned up). Ms. Iyer fails to state a claim for two reasons.[3]

*First*, Ms. Iyer's theory appears to be premised on the wrong purported contracts. She says that "GW breached the covenant of good faith and fair dealing by discriminating and retaliating against Ms. Iyer repeatedly[.]" Am. Compl. ¶ 99. So her claim turns on the existence of a contract

---

[3] The Court applies District of Columbia law for the above reasons. *See supra*, at 23.

prohibiting GW from discriminating and retaliating. But for reasons explained above, the Non-Discrimination Policy is not a contract, and the language in the Mistreatment Policies and Procedures prohibiting retaliation shows no intent to be bound. *See supra*, at 24–25. "[A] claim for breach of the implied covenant of good faith and fair dealing cannot exist in the absence of a contractual relationship." *Busby v. Cap. One, N.A.*, 772 F. Supp. 2d 268, 284 (D.D.C. 2011) (citing *Kerrigan v. Britches of Georgetowne, Inc.*, 705 A.2d 624, 627 (D.C. 1997)). So without a contract prohibiting discrimination or retaliation, Ms. Iyer fails to state a claim.

*Second*, even if the alleged discrimination or retaliation did breach a contract, Ms. Iyer's allegation of bad faith is too conclusory. As the Defendants argue, Ms. Iyer has "failed to cite any instances of bad faith or arbitrary and capricious conduct on behalf of GW." Mot. Dismiss at 27. She says that "GW's bad faith motivation for breaching the contracts was deliberate and were in conjunction with GW's ire at Ms. Iyer filing complaints against Dean Davis and Dr. Gaba." Am. Compl. ¶ 99. But she provides no facts to support this. "A claim for breach of the implied covenant of good faith and fair dealing cannot survive a motion to dismiss based on conclusory allegations that a defendant was trying to evade the spirit of the contract." *PeaceTech Lab, Inc. v. C5 Accelerate LLC*, No. 20-cv-922, 2021 WL 106718, at *8 (D.D.C. Jan. 2021) (citing *Mero v. City Segway Tours of Washington DC, LLC*, 826 F. Supp. 2d 100, 107 (D.D.C. 2011)). The allegation that GW was motivated by ire resembles cases where an allegation of intent alone was insufficient. *See PeaceTech Lab, Inc.*, 2021 WL 106718, at *8 ("PeaceTech merely states that '[o]n information and belief, Mr. Pienaar intended to use his promises to PeaceTech to gain influence and clout in Washington, DC, but did not intend to follow through on his and his companies' obligations to PeaceTech.'"). It falls short of the level of detail that has passed muster. *See, e.g.*, *Paulin*, 878 F. Supp. 2d at 248 ("The facts alleged by Plaintiff in her Complaint, taken as

true, do indeed meet that standard."); *see also* Compl. ¶ 73, *Paulin v. George Washington Univ. Sch. of Med. & Health Scis.*, 878 F. Supp. 2d 241, 247 (D.D.C. 2012) (No. 12-cv-86), ECF No. 1 (alleging that "Dr. Orcutt herself dismissed the preceptors from the room and proceeded to belittle Ms. Paulin and to ask intrusive and inappropriate questions about her personal life"). The Court therefore dismisses this claim.

### G.    Intentional Infliction of Emotional Distress

Finally, Ms. Iyer brings a tort claim against Dean Davis and Dr. Gaba for intentional infliction of emotional distress. *See* Am. Compl. ¶¶ 102–07. The Court agrees with the Defendants that she fails to allege facts sufficient to support such a claim. While the alleged comments are troubling, to be sure, they do not amount to the sort of conduct necessary to establish a claim for the intentional infliction of emotional distress under District of Columbia law.[4]

"[To] succeed on a claim of intentional infliction of emotional distress, a plaintiff must show (1) extreme and outrageous conduct on the part of the defendant which (2) intentionally or recklessly (3) causes the plaintiff severe emotional distress." *Duncan v. Children's Nat. Med. Ctr.*, 702 A.2d 207, 211 (D.C. 1997) (quoting *Drejza v. Vaccaro*, 650 A.2d 1308, 1312 (D.C. 1994). "There is no general duty of care to avoid causing mental distress, and liability is not imposed for all conduct which causes mental distress." *Id.* at 211 (cleaned up). "Rather, a claim for intentional infliction of emotional distress contemplates acts so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency." *Id.* (cleaned up). Ms. Iyer fails to allege facts that meet the mark.

*First*, she claims that Dean Davis and Dr. Gaba caused her "severe emotional distress" by their "extreme and outrageous conduct." Am. Compl. ¶ 103. Beginning with Dr. Gaba, Ms. Iyer

---

[4] The Court applies District of Columbia law for the above reasons. *See supra*, at 23.

alleges that Dr. Gaba "yelled at her and berated her in front of other staff and made negative comments about her to other faculty members." *Id.* ¶ 30. But these sorts of "insults" and "indignities" are not "beyond all possible bounds of decency" and are not "regarded as atrocious and utterly intolerable in a civilized community." *Waldon v. Covington*, 415 A.2d 1070, 1076 (D.C. 1980) (cleaned up).

And Ms. Iyer's allegations about Dean Davis fare no better. She claims that he compared her "appearance and mannerisms to a former lover of his who had been a 'toxic' influence in his life, and he inquired about Ms. Iyer's relationship history and current status." *Id.* ¶ 29. She also says that he swore at her and said that there was no way her father was proud of her. *Id.* It is true that "the District of Columbia Court of Appeals has long declared that the creation of a hostile work environment by . . . sexual harassment may, upon sufficient evidence, constitute a *prima facie* case of intentional infliction of emotional distress." *Hoskins v. Howard Univ.*, 839 F. Supp. 2d 268, 282 (D.D.C. 2012) (cleaned up). But this holding has been "limited . . . to cases in which the plaintiff can show a pattern of harassment." *Paul v. Howard Univ.*, 754 A.2d 297, 308 (D.C. 2000) (cleaned up). The "few isolated incidents" of harassment alleged in the Amended Complaint are therefore insufficient to state a claim. *Id.*

*Second*, Ms. Iyer claims that Dean Davis and Dr. Gaba inflicted emotional distress by "punishing her for filing complaints of harassment and abuse against them." Am. Compl. ¶ 104. But it is not entirely clear from the Amended Complaint what this punishment looked like. One read is that they sent "letters of concern" to the Subcommittee as retaliation. *See* Am. Compl. ¶ 63(a). Another read is that Dr. Gaba changed Ms. Iyer's grade to "conditional," *id.* ¶ 34, and Dean Davis placed a call that flustered Ms. Iyer before her interview, *see id.* ¶ 35. Either way, these allegations do not satisfy the high standard required to state a claim of the

intentional infliction of emotional distress. *Cf. Wanko v. Catholic Univ. of Am.*, No. 08-cv-2115, 2009 WL 3052477, at *1–2, 5–6 (D.D.C. Sept. 22, 2009) (dismissing an intentional infliction of emotional distress claim where the plaintiff alleged that the professor of a course changed his grade from a B to an F at the request of an assistant dean and that the defendants "conspired to retaliate against him because of his discrimination complaints" (cleaned up)).

To be sure, the D.C. Court of Appeals has acknowledged that retaliation for harassment complaints may sometimes be "so extreme and outrageous to permit recovery." *King v. Kidd*, 640 A.2d 656, 673 (D.C. 1993). For example, in *King v. Kidd*, "after the plaintiff filed a formal complaint, the employer 'took active steps to help [the alleged harasser] defeat' the complaint; helped the harasser transfer the plaintiff against her will; 'withdrew [the plaintiff's] eligibility for a promotion;' asked the plaintiff to sign a statement that would in effect absolve [the harasser] from any foul play;' and denied the plaintiff a promotion by falsely claiming she had been transferred 'at her own request.'" *Doe v. Lee*, No. 19-cv-85, 2020 WL 759177, at *10 (D.D.C. Feb. 14, 2020) (quoting *King*, 640 A.2d at 672–74). But even all of that provided only "the critical mass of evidence justifying liability" in combination with other conduct. *King*, 640 A.2d at 673. The alleged retaliatory actions by Dr. Gaba and Dean Davis are weak in comparison. *Cf. Wise v. District of Columbia*, No. 03-cv-310, 2005 WL 818622, at *5 (D.D.C. Apr. 8, 2025) (providing as an alternative basis for dismissal the fact that terminating an employee for complaining about contract law violations did not amount to "conduct so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency").

Ms. Iyer argues that she satisfied the pleading standard by alleging that this conduct was "extreme and outrageous," insisting that "the Court must accept as true all of Ms. Iyer's factual allegations[.]" Opp'n at 17. But this is too conclusory to survive a motion to dismiss. *See Ashcroft*

*v. Iqbal*, 556 U.S. 662, 663 (2009) ("[T]he tenet that a court must accept a complaint's allegations as true is inapplicable to threadbare recitals of a cause of action's elements, supported by mere conclusory statements." (citation omitted)). The Court thus dismisses this claim.

## CONCLUSION

For the foregoing reasons, the Court denies the Defendants' Motion to Dismiss, ECF No. 15, as to Count 1 (discrimination under the ADA and the Rehabilitation Act), Count 2 (retaliation under the ADA and the Rehabilitation Act), and Count 4 (breach of contract), and it grants the Defendants' Motion to Dismiss, *id.*, as to Count 3 (disability harassment under the ADA and the Rehabilitation Act), Count 5 (breach of the covenant of good faith and fair dealing), and Count 6 (intentional infliction of emotional distress).

A separate order will issue.

_____
SPARKLE L. SOOKNANAN
United States District Judge

Date:   March 31, 2025