**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| SNEHA IYER, |  |
| *Plaintiff*, |  |
| v. | Civil Action No. 24 - 130 (SLS) |
|  | Judge Sparkle L. Sooknanan |
| GEORGE WASHINGTON UNIVERSITY SCHOOL OF MEDICINE AND HEALTH SCIENCES, *et al.*, | **REDACTED** |
| *Defendants*. |  |

## MEMORANDUM OPINION

Sneha Iyer was a student at George Washington University School of Medicine and Health Sciences (GW) until a series of disciplinary findings led to her withdrawing from medical school on the eve of her graduation. She brought this lawsuit alleging that GW unlawfully interfered with her ability to complete her medical degree. Ms. Iyer, who has been diagnosed with several mental health disabilities, contends that her disabilities prevented her from meeting her professional obligations and caused her to invent excuses for those shortcomings. In one notable instance, Ms. Iyer fabricated that she suffered from a malignant brain tumor and had surgery to remove that tumor. In another, she feigned an ectopic pregnancy. The record is replete with other falsehoods—all to excuse a pattern of unexcused absences and missed obligations. Ms. Iyer claims that GW had an obligation to recognize her evident disabilities and need for accommodation. And she contends that GW violated Title III of the Americans with Disabilities Act (ADA), Section 504 of the Rehabilitation Act, and its own policies and procedures by failing to do so. But Ms. Iyer's claims fail as a matter of law. The Court thus grants GW's motion for summary judgment.

## BACKGROUND

### A.        Factual Background

The Court draws the facts from the Parties' statements of material facts and the underlying materials referenced in those statements. *See* Def.'s Statement of Material Facts, ECF No. 45-1; Pl.'s Counter-Statement of Disputed Facts, ECF No. 50-1; Def.'s Resp. to Pl.'s Counter-Statement of Disputed Facts (CSDF), ECF No. 49-3; Joint Statement of Agreed Upon Facts (JSF), ECF No. 52. The Court assumes the facts in those statements to be true unless they have been specifically disputed. *See* Fed. R. Civ. P. 56(e)(2); *see also* LCvR 7(h)(1).[1]

Ms. Iyer enrolled as a medical student at GW in the fall of 2018. JSF ¶ 6. In 2019, she registered with the University's Disability Support Services office (DSS), reporting that she had been diagnosed with ███████████████, ██████████, and ██████, and requesting an accommodation to complete "testing in a separate room." JSF ¶¶ 117–119. DSS approved that sole accommodation request. JSF ¶ 120. Medical school faculty are not involved in the process of reviewing and approving accommodation requests. JSF ¶ 121. Rather, DSS "informs the medical school what the accommodation should be and [the medical school Dean] provides that accommodation information to the appropriate faculty members and professors." JSF ¶ 122.

### 1.        2021 Subcommittee Proceedings

During Ms. Iyer's third year of medical school, when she began clinical clerkship rotations, faculty members started raising concerns about her professionalism. JSF ¶ 7. In March 2021, GW's Subcommittee on Honor and Professionalism, made up of students and faculty members, initiated proceedings to review written concerns from the Director of the Pediatrics Clerkship, the Director

---

[1] Local Civil Rule 7(h) provides that "the Court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." LCvR 7(h)(1).

of the Obstetrics/Gynecology (OB/GYN) Clerkship, the Director of the Psychiatry Clerkship, and the Internal Medicine VA Site Director. JSF ¶¶ 8; Def. Ex. 3, at 134.[2]

At the hearing, these faculty members raised concerns about Ms. Iyer's missed clinical time, unexcused absences, and dishonesty. JSF ¶¶ 10–17, 20–22. They complained about:

- Ms. Iyer seeking an excused absence due to "not feeling well" because of "having diabetes and taking insulin." JSF ¶ 12 (boldface omitted). Ms. Iyer has never had diabetes or needed to take insulin. JSF ¶ 13.

- Ms. Iyer claiming that she suffered from diabetes and an ectopic pregnancy during a conversation with a professor over her absences. CSDF ¶ 18. Ms. Iyer was never pregnant during this period. JSF ¶ 19.

- Ms. Iyer providing conflicting information about "having a flood in her apartment during an exam," but later saying that her "browser had frozen." JSF ¶ 10.

- Communication and attendance lapses during Ms. Iyer's internal medicine rotation and her dishonesty about her whereabouts when she missed clerkship time due to a snowstorm. JSF ¶ 22.

- Ms. Iyer "not being there, not advising of needing to miss or be late . . . not [being] accountable for her word." JSF ¶ 14 (alterations in original).

- Ms. Iyer "gaming the system" based on the attendance policy in effect at the time due to COVID-19. JSF ¶ 20.

Two medical students also raised concerns about Ms. Iyer's alleged misuse of ███████████████,

unexcused absences, and mental health generally. CSDF ¶¶ 23–27, 192-193, 199, 204.

While Ms. Iyer admitted that there were some communication lapses, she disputed certain statements by faculty and characterizations of her conduct by other medical students. Def. Ex. 3, at 135. The Subcommittee unanimously voted to suspend Ms. Iyer for one year and determined

---

[2] The Defendants' exhibits are attached to their Motion for Leave to File Summary Judgment Motion, ECF No. 43, and Reply, ECF No. 49. The Plaintiff's exhibits are attached to her Opposition. ECF No. 47.

that she needed to repeat her entire third year of medical school. JSF ¶¶ 4, 38. In explaining its decision, the Subcommittee noted that it:

> was concerned about what appeared to be a repeated pattern of concern from multiple attending physicians from different areas of the medical school. The Subcommittee deliberated at length and ultimately had serious concerns about Ms. Iyer's behavior and more importantly, her insight into the severity of her actions and their potential impact on her professionalism as a practicing physician.

JSF ¶ 32 (boldface omitted).

Following the hearing, an associate professor of psychiatry raised additional concerns about Ms. Iyer's "pattern of absence and tardiness, a lack of timely communication with clerkship leadership, and dishonesty with her team." JSF ¶¶ 34–35. The Subcommittee reviewed those concerns and Ms. Iyer's response and decided to proceed with its original decision to suspend Ms. Iyer for one year and require her to repeat her third year. JSF ¶ 36.

Ms. Iyer appealed part of the Subcommittee's decision to Dean Richard Simons. JSF ¶ 37. While she did not appeal the mandatory leave of absence, she did appeal the requirement that she repeat her third year. JSF ¶ 38. Dean Simons modified the Subcommittee's decision, requiring Ms. Iyer to repeat only three clinical clerkships rather than her entire third year of medical school. JSF ¶¶ 37–39. Dean Simons warned Ms. Iyer that "[her] progress on the retake of these clerkships [would] be closely monitored and any other significant lapses in [her] professional behavior could lead to more serious consequences." JSF ¶ 40 (emphasis omitted).

### 2.      2023 Subcommittee Proceedings

In April 2022, Ms. Iyer restarted her third-year clinical rotations following her one-year suspension. JSF ¶ 41. Less than ten days after she returned, faculty members once again began raising concerns. JSF ¶ 42. This continued throughout 2022, resulting in a second hearing before the Subcommittee on Honor and Professionalism in February 2023. JSF ¶ 43. The 2023

Subcommittee heard concerns about Ms. Iyer's professionalism in three areas: (1) her internal medicine rotation, (2) her OB/GYN rotation, (3) and her residency applications. JSF ¶ 44.

*Internal Medicine*. A faculty member presented student concerns about Ms. Iyer's "unexplained lateness to or departures from rounds," inappropriate communication boundaries, and "sleeping during afternoon rounds while other members of the team were working." *See* CSDF ¶ 55. Ms. Iyer missed six days during the first two weeks of her internal medicine clerkship in August 2022 and received a conditional clinical grade. JSF ¶¶ 46, 49. Some of her absences were due to ████████, but others were "no shows." JSF ¶ 46. Ms. Iyer appealed her conditional grade to the Internal Medicine Clerkship Director, and thereafter to the Interim Chair of Internal Medicine. JSF ¶¶ 49, 52; *see* CSDF ¶ 47 (identifying Dr. Anne Lesburg as the Internal Medicine Clerkship Director). Both upheld the grade, JSF ¶¶ 50, 53, noting that Ms. Iyer had been absent on days that her calendar said that she was present, Def. Ex. 20, at 2953. Ms. Iyer further appealed to Dean Simons, who also upheld the conditional grade. JSF ¶ 54.

*OB/GYN*. Ms. Iyer's OB/GYN rotation was the source of various professional and dishonesty concerns, too. On September 16, 2022, Ms. Iyer informed an OB/GYN attending that she could not be present that day due to a miscarriage. JSF ¶ 58. A couple days later, she again told a faculty member that she had a miscarriage. JSF ¶ 61. The Parties dispute whether she had a miscarriage and whether she sought in-person medical treatment, CSDF ¶¶ 59, 62, but none of her medical records indicate that she was pregnant during this period, *see* CSDF ¶ 59.

On September 13, 2022, Ms. Iyer told Dr. Nancy Gaba and Dr. Jennifer Keller that she needed to take a sick day because of excruciating back pain and a brain malignancy. JSF ¶ 64. Ms. Iyer later confirmed that she did not have a malignant brain tumor. JSF ¶ 65. On September 22, 2022, Dr. Gaba met with Ms. Iyer regarding her professionalism issues and thereafter wrote an

email to Dean Goldberg detailing her concerns about Ms. Iyer's conduct. JSF ¶¶ 140, 215;

Pl. Ex. 24. Dr. Gaba explained:

> I have VERY serious concerns about Sneha's professionalism. She is not accountable for her actions and her veracity is questionable. This makes me concerned that the information she gathers from patients may not be true, and I wonder if she can be trusted to interview patients and report back truthfully. I am concerned that this could impact patient care. . . . I ask that you consider these serious breaches of professionalism and Sneha's veracity carefully. I would not trust her to see or evaluate a patient and report back unless she was directly supervised by a resident or an attending physician.

Pl. Ex. 24. Ms. Iyer then sent Dr. Gaba an email apologizing for her actions and asking whether

she could make up the missed time. JSF ¶ 220; Pl. Ex. 29. Dr. Gaba did not respond to this email.

JSF ¶ 220. Dr. Gaba documented additional professional concerns in letters to Dean Goldberg on

October 18, 2022, and November 16, 2022, about conduct that occurred that fall. JSF ¶¶ 212, 215.

Ms. Iyer disputes the accuracy of Dr. Gaba's concerns. *See* CSDF ¶¶ 216–253.

*Residency*. Ms. Iyer's residency application process was another source of concerns. In

September 2022, Dean Simons and Dean Steven Davis prepared Ms. Iyer's "Dean's Letter," which

provided information about her to all residency programs that she applied to. JSF ¶ 66. Because

Ms. Iyer informed the school that she was diagnosed with a brain tumor and underwent a brain

tumor removal during her one-year suspension from medical school, this fact was included in her

Dean's Letter. *Id.*; *see also* Mot. Hr'g Tr. 42:13–17 (counsel for Ms. Iyer acknowledging that

Ms. Iyer told medical school officials she had a brain tumor).[3] Before sending the letter, Dean

Davis asked Ms. Iyer in two separate emails to confirm that the brain-tumor information was "both

true and accurate." JSF ¶ 67. Ms. Iyer responded: "I approve and it is correct." JSF ¶ 68. Dean

Davis thus sent a letter to every residency program that Ms. Iyer applied to stating: "It should be

---

[3] The Court cites to the Bench Draft of the Motion Hearing Transcript.

noted that Ms. Iyer was diagnosed with a brain tumor during her [leave of absence] and underwent removal of the tumor. She has recovered well and has no residual effects." JSF ¶ 66. Again, Ms. Iyer later confirmed that she neither had a malignant brain tumor nor a procedure to remove a brain tumor. JSF ¶ 65; *see also* Mot Hr'g Tr. 42:18–19.

On November 18, 2022, Ms. Iyer failed to appear to a noon residency interview with Allegheny Health Network and texted the residency program coordinator at 12:13 PM, thirteen minutes after the interview's scheduled time, stating that she had a "meeting with her Dean and [it] went late." JSF ¶¶ 78, 83–84. At 12:22 PM that day, Dean Davis called Ms. Iyer—nine minutes after Ms. Iyer sent that text and twenty-two minutes after her interview was supposed to start. JSF ¶ 87. Three hours after Ms. Iyer missed her interview, she sent an email to the residency program coordinator and to two doctors at Allegheny Health Network stating the following:

> Around 11 am, I received a message from the Dean of [the] medical school asking to call me. I was a bit thrown off, and I found out that he was calling me to inform me of a huge personal loss. A very close friend of mine from medical school had been missing and just passed away.

JSF ¶¶ 88–89 (boldface omitted). In response to this email, one of the Allegheny Health Network doctors reached out to Dean Barbara Bass at GW regarding the missing student, and Dean Bass convened an emergency meeting of the school's deans to gather information to identify the potentially ill or deceased classmate of Ms. Iyer. JSF ¶¶ 93–94. But no medical student at GW had been missing or passed away. *See* JSF ¶ 91. On December 1, 2022, having determined that Ms. Iyer had fabricated the story, Dean Davis submitted a letter of concern to the Subcommittee regarding the incident. JSF ¶¶ 96, 293–94.

The second Subcommittee hearing was held on February 9, 2023. JSF ¶ 144. ███████████ ███████, Ms. Iyer's treating ████████, testified at the hearing on Ms. Iyer's behalf after submitting a letter to the Subcommittee. JSF ¶ 296. ██████████ explained that Ms. Iyer's ██████

and ▇▇▇▇▇▇ accounted for some of her concerning conduct. JSF ¶¶ 296–305. She explained that lying is a common result of the ▇▇▇▇▇▇▇▇▇▇ that Ms. Iyer experienced. JSF ¶¶ 297, 303–04. And she testified that she had prescribed Ms. Iyer with new treatment in June 2022; that "Ms. Iyer's symptoms had improved significantly between June and September 2022"; that she met with Ms. Iyer regularly; and that they had worked to get the right combination of medications, with which Ms. Iyer was compliant. JSF ¶¶ 298–99. She also testified that she had prescribed Ms. Iyer new medication in December 2022 that she thought "made a huge difference" and made her "confident in Ms. Iyer's ability to succeed in her future training." JSF ¶¶ 184, 305; *see also* Mot. Hr'g Tr. 41:15–16.

The 2023 Subcommittee unanimously voted to dismiss Ms. Iyer from the medical program. JSF ¶ 5. Ms. Iyer appealed the decision to Dean Bass, JSF ¶ 103, and ▇▇▇▇▇▇ submitted an additional letter to Dean Bass in support of Ms. Iyer, JSF ¶ 341. Dean Bass upheld the 2023 Subcommittee's decision dismissing Ms. Iyer. JSF ¶ 109. When deposed, she explained that professionalism was "one of our core competencies for [GW's] medical students," and that "there is [no] accommodation that [the] medical school could provide to Ms. Iyer that would allow her to lie." JSF ¶¶ 109, 112 (boldface omitted). She also agreed that both the 2021 and 2023 Subcommittees had "identified a pattern of conduct that Ms. Iyer was unfit to join the medical profession." Def. Ex. 1, at 86:16–21. Dean Bass gave Ms. Iyer a choice: voluntarily withdraw from medical school or be dismissed. JSF ¶ 113. On April 12, 2023, Ms. Iyer voluntarily withdrew from GW. *Id.*; *see* Pl. Ex. 9, at 1.

### 3.    Complaint Against Dr. Gaba

Prior to the Subcommittee hearing, on January 5, 2023, Ms. Iyer met with Dr. Jennifer Keller, the Director of the Office of Professional and Respectful Learning and Chair of the

Committee on Learning Environment at GW. JSF ¶¶ 142, 308; Pl. Ex. 74, at 7494. Ms. Iyer raised concerns about Dr. Gaba's conduct, including noting that Dr. Gaba had tried to contact Ms. Iyer's physician directly to confirm her excuses for absences. JSF ¶ 309. Dr. Keller agreed to try to help Ms. Iyer complete any make-up time with someone other than Dr. Gaba. JSF ¶ 311.

Two days after the Subcommittee hearing, Ms. Iyer emailed Dr. Keller seeking to file a mistreatment complaint against Dr. Gaba. JSF ¶¶ 144, 152. And on March 8, 2023, Ms. Iyer filed a formal complaint under the medical school's "Mistreatment Policy." JSF ¶¶ 145, 318–19. Dr. Keller initially started the formal complaint procedure in response to Ms. Iyer's complaint. JSF ¶ 318; Pl. Ex. 73. However, on March 30, 2023, Dr. Keller informed Ms. Iyer that the policy required a consultation procedure before the filing of a formal complaint—a step that they had skipped. JSF ¶¶ 157, 324; Pl. Ex. 74. Dr. Keller thus "pause[d] the formal complaint procedure" to initiate a consultation process with an Ombudsperson or decanal staff. JSF ¶ 157; Pl. Ex. 74. She explained that "[i]f the consultation procedure fail[ed] to resolve the allegations satisfactorily, [Ms. Iyer] or Dr. Gaba [could then] initiate a formal complaint." JSF ¶ 157; Pl. Ex. 74. Dr. Keller also informed Ms. Iyer that she would be recusing herself from the matter and would instead appoint an interim chair to oversee the process as she was Dr. Gaba's OB/GYN colleague. JSF ¶ 325; Pl. Ex. 74.

The appointed Ombudsperson, Dr. Lisa Shwartz, met with Ms. Iyer for three hours to discuss her mistreatment allegations and documentation. JSF ¶ 159. On April 21, 2023, the interim chair, Dr. Alan Wasserman, informed Ms. Iyer by email that after reviewing the evidence from her, Dr. Shwartz, and Dr. Gaba, he found that no mistreatment occurred. JSF ¶ 327; Pl. Ex. 76. Dr. Wasserman noted that "this conclude[d] the matter." Pl. Ex. 76.

9

### 4.    Post-Medical School

After her withdrawal from medical school, Ms. Iyer enrolled in the Masters in Business Administration (MBA) degree program at Georgetown University. JSF ¶ 349. Ms. Iyer received accommodations at Georgetown, including extensions for assignments, flexibility in attendance, permission to leave the classroom for medical needs, extended testing time, private testing rooms, and breaks during testing. JSF ¶ 350. She successfully completed the Georgetown MBA program. *Id.*

But Ms. Iyer continued to have issues with honesty and professionalism following her departure from GW and during her time at Georgetown. In June 2023, Ms. Iyer seemingly represented to Georgetown's admissions office that she "completed med school in May," Def.'s Ex. 65, at 12787, ECF No. 49-5, despite having withdrawn from medical school the month before. And upon completion of her MBA program, Ms. Iyer again represented in writing in a commencement form that she had completed medical school. *Id.* at 12901. But the Associate Dean reached out to Ms. Iyer to flag a discrepancy given that Ms. Iyer's LinkedIn profile said "MD candidate" and "Prior MD training." *Id.* In response, Ms. Iyer wrote the following email in April 2025:

> In summary, the reason for the discrepancy is due to litigation.
>
> When I was in medical school, I was sexually harassed and faced retaliation for filing Title 9. So, after I got my M.D. and my National Provider Identification number and official license, I sued my medical school. They retaliated by threatening to revoke my degree, which led to me having to give up my matched residency spot. About 2 weeks ago, the judge ruled in my favor for retaliation, discrimination, breach of contract, and equitable relief.
>
> The official paperwork has yet to go through, so perhaps it would be best to leave it out for graduation.

*Id.* at 12901–02 (emphasis added).

10

### B.      Procedural Background

Ms. Iyer filed the operative Amended Complaint on April 23, 2024, against GW, Dean Davis, and Dr. Gaba, seeking compensatory damages, punitive damages, and readmission to GW. She brought claims for disability discrimination, retaliation, and harassment under the ADA and the Rehabilitation Act, as well as claims for intentional infliction of emotional distress, breach of contract, and breach of the covenant of good faith and fair dealing. *See* Am. Compl., ECF No. 13. The Defendants moved to dismiss under Federal Rule of Civil Procedure 12(b)(6). Mot. Dismiss, ECF No. 15. The Court granted that motion in part and denied it in part, dismissing Ms. Iyer's claims for disability harassment, breach of the covenant of good faith and fair dealing, and intentional infliction of emotional distress, but permitting her discrimination, retaliation, and breach of contract claims to continue to discovery. *See Iyer v. George Washington Univ. Sch. of Med. & Health Scis.*, No. 24-cv-130, 2025 WL 2192985 (D.D.C. Aug. 1, 2025). This dismissal extinguished the claims against the individual defendants, leaving GW as the only remaining defendant in this action.

Following discovery, GW now seeks summary judgment on the remaining claims. Mot., ECF No. 45. The motion is fully briefed, and the Court held a motion hearing on April 10, 2026. Opp'n, ECF No. 50; Reply, ECF No. 49; Min. Entry (Apr. 10, 2026). At Ms. Iyer's request, the Court provided an opportunity to submit a supplemental filing following the hearing, but Ms. Iyer elected not to submit anything additional. *See* Min. Entry (Apr. 10, 2026).

## LEGAL STANDARD

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The burden is on the movant to make the initial showing of the absence of any genuine issues of material fact." *Ehrman v. United States*, 429 F. Supp. 2d 61, 66

(D.D.C. 2006). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [its] favor." *Est. of Parsons v. Palestinian Auth.*, 651 F.3d 118, 123 (D.C. Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion" by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

A court may "evaluate an inadequately supported assertion of material fact and deem it not materially disputed." *Grimes v. District of Columbia*, 794 F.3d 83, 92 (D.C. Cir. 2015). And "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Lash v. Lemke*, 786 F.3d 1, 6 (D.C. Cir. 2015) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

## DISCUSSION

GW asks the Court to grant summary judgment in its favor on Ms. Iyer's claims for: (1) discrimination under the ADA and the Rehabilitation Act, (2) retaliation under the ADA and the Rehabilitation Act, and (3) breach of contract. The Court agrees that GW is entitled to summary judgment. Ms. Iyer's discrimination claim fails because there is no genuine dispute of material fact that she is not otherwise qualified to be a medical student at GW. Her retaliation claim comes up short because there are insufficient facts for a jury to infer that her dismissal was motivated by any protected activity under the ADA or the Rehabilitation Act. And her breach of contract claim fails because the undisputed facts show that GW complied with all relevant contractual obligations.

12

### A.    Academic Deference

Before turning to Ms. Iyer's claims, the Court addresses GW's reliance on the Supreme Court's decision in *Regents of the University of Michigan v. Ewing*, 474 U.S. 214 (1985), to argue that this Court should afford it academic deference. Mot. 23. In *Ewing*, the Supreme Court held in the due process context that "[w]hen judges are asked to review the substance of a genuinely academic decision, . . . they should show great respect for the faculty's professional judgment." 474 U.S. at 225. In reaching that conclusion, the Court relied on an earlier decision reasoning that whether to dismiss a student for academic reasons requires "an expert evaluation of cumulative information and [is] not readily adapted to the procedural tools of judicial or administrative decisionmaking." *Id.* at 226 (quoting *Bd. of Curators of the Univ. of Mo. v. Horowitz*, 435 U.S. 78, 90 (1978)). The D.C. Circuit has afforded similar deference to claims for breach of contract under D.C. law. *See Chenari v. George Washington Univ.*, 847 F.3d 740, 744–45 (D.C. Cir. 2017). But whether *Ewing* applies to discrimination claims under the ADA or the Rehabilitation Act is an open question.

It is true that some courts have applied *Ewing* deference in discrimination cases, including cases for disability discrimination. *See* Reply 6 n.2 (collecting cases). But others have held that "the *Ewing* formulation [is] inappropriate in cases based on the Nation's discrimination statutes," as "[a]cademic institutions are in no way exempt from our discrimination laws. Nor are there separate and more lenient standards for them." *Novak v. Bd. of Trs. of S. Ill. Univ.*, 777 F.3d 966, 976 (7th Cir. 2015). These courts reason that "the Supreme Court has noted specifically that [the *Ewing*] formulation applies only to '*legitimate* academic decision[s]' and that academic decisions that are discriminatory are not legitimate." *Id.* at 975–76 (quoting *Univ. of Pa. v. EEOC*, 493 U.S. 182, 199 (1990)).

13

Both the Supreme Court and the D.C. Circuit have declined to apply *Ewing* deference in Title VII cases. *See Mawakana v. Bd. of Trs. of the Univ. of D.C.*, 926 F.3d 859, 864 (D.C. Cir. 2019) (citing *Univ. of Pa.*, 493 U.S. 182). And the D.C. Circuit has declined to apply *Ewing* to an Age Discrimination in Employment Act claim. *See Steele v. Mattis*, 899 F.3d 943, 948 (D.C. Cir. 2018) ("[N]othing in the ADEA supports the automatic imposition of a heightened pretext burden just because the defendant is an academic institution."). But the D.C. Circuit has not addressed *Ewing*'s applicability to claims brought under the ADA or the Rehabilitation Act. *See Chenari*, 847 F.3d at 744–49 (applying academic deference under D.C. law to a breach of contract claim but not addressing whether *Ewing* deference applies to an ADA/Rehabilitation Act claim). Indeed, the Circuit has expressly left open the appropriateness of *Ewing* deference when a discrimination claim turns on a "genuinely academic decision"—*i.e.*, "when the question before the court turns on the merits of an academic disagreement or a plaintiff's substantive qualifications." *Steele*, 899 F.3d at 948–49 (cleaned up).

Because GW is entitled to summary judgment here without deference, the Court need not address whether *Ewing* deference is appropriate for Ms. Iyer's ADA and Rehabilitation Act claims. And the Court declines to grant academic deference when reviewing Ms. Iyer's breach of contract claim because such deference is limited to academic decisions like dismissal, not issues like mistreatment allegations. *See Iyer*, 2025 WL 2192985, at *13 (citing *Freeman v. Howard Univ. Coll. of Med.*, No. 21-cv-2191, 2022 WL 4289640, at *3 (D.D.C. Sep. 16, 2022)).

### B.    Discrimination

The Parties dispute whether summary judgment is appropriate on Ms. Iyer's disability discrimination claim under the ADA and the Rehabilitation Act. *See* Mot. 27; Opp'n 12. Title III of the ADA prohibits places of public accommodation from discriminating against an individual

"on the basis of disability." 42 U.S.C. § 12182(a). And Section 504 of the Rehabilitation Act bars recipients of federal funds from discriminating against an individual with a disability "solely by reason of her or his disability." 29 U.S.C. § 794(a). Proving a violation of either statute requires a "virtually identical" showing. *Harrison v. Rubin*, 174 F.3d 249, 253 (D.C. Cir. 1999). "The only difference is that the ADA's causation standard is slightly less strict than the Rehabilitation Act's standard because the ADA does not require that the discrimination be 'solely' because of an individual's disability." *Iyer*, 2025 WL 2192985, at \*5 (cleaned up). The ADA requires that a plaintiff show that discrimination is a motivating factor while the Rehabilitation Act uses but-for causation. *See Drasek v. Burwell*, 121 F. Supp. 3d 143, 154 (D.D.C. 2015). Thus, "the analysis for these claims is essentially the same, save for a slight difference regarding causation." *Iyer*, 2025 WL 2192985, at \*5 (cleaned up).

To succeed on a disability discrimination claim, a plaintiff must demonstrate (1) that she has a qualifying disability, (2) that she was excluded from or denied "benefits, services, programs, or other activities" by the defendant, and that (3) "the exclusion, denial, or discrimination was by reason of plaintiff's disability." *Id.* But even if a plaintiff meets her burden, a defendant is not liable for disability discrimination if it establishes that the plaintiff is not "otherwise qualified" for the services or programs, 29 U.S.C. § 794(a), or if "modifications" to accommodate the plaintiff would "fundamentally alter" the nature of the services or programs, 42 U.S.C. § 12182(b)(2)(A)(ii). GW argues that Ms. Iyer's disability discrimination claim fails because: (1) she cannot establish causation, and (2) she is not otherwise qualified for the medical program

15

even if she meets the other elements of a discrimination claim under the ADA and the Rehabilitation Act. *See* Mot. 28–31; Opp'n 5, 12.[4]

### 1. Causation

GW argues that Ms. Iyer cannot demonstrate that her dismissal was "because of" a disability as opposed to a legitimate, nondiscriminatory reason—*i.e.*, "attendance, communication, and honesty" concerns. Mot. 33. It is true that failure to satisfy an educational "program's professional and academic requirements" is normally "a legitimate, nondiscriminatory reason" for dismissal. *Waggel v. George Washington Univ.*, 957 F.3d 1364, 1374 (D.C. Cir. 2020) (quoting *Figueroa v. Pompeo*, 923 F.3d 1078, 1087 (D.C. Cir. 2019)). But Ms. Iyer has presented evidence that her dishonesty and other professional failures are direct symptoms of her disability. JSF ¶¶ 297, 303–04 (determinations of ███████); CSDF ¶¶ 177, 180, 183, 185-86 (determinations of Dr. Shama Rasheed, Ms. Iyer's expert). And "conduct resulting from a disability is considered to be part of the disability, rather than a separate basis for termination." *Dark v. Curry Cnty.*, 451 F.3d 1078, 1084 (9th Cir. 2006) (quoting *Humphrey v. Mem'l Hosps. Ass'n*, 239 F.3d 1128, 1139–40 (9th Cir. 2001)).[5] Thus, a reasonable jury could conclude that Ms. Iyer's dismissal because of her "attendance, communication, and honesty," Mot. 33, was a dismissal "because of" a disability.

Next, GW argues that Ms. Iyer cannot show causation because the relevant decision makers did not have knowledge of her disability and need for accommodations. Mot. 31. Indeed, Ms. Iyer

---

[4] Neither Party disputes that Ms. Iyer's ██████████████████, ████████, and █████ constitute disabilities for purposes of the ADA and the Rehabilitation Act. *See, e.g.*, Mot. 17. GW does dispute that it had notice of other disabilities that Ms. Iyer has since been diagnosed with. *See* Mot. 18. But either way, those disabilities are immaterial to the Court's analysis.

[5] The Court recognizes that there is a circuit split on the question whether misconduct resulting from a disability is considered part of the disability itself. *See Caporicci v. Chipotle Mexican Grill, Inc.*, 729 F. App'x 812, 816 n.5 (11th Cir. 2018) (outlining split). The Court uses the Ninth Circuit's more lenient standard because Ms. Iyer cannot succeed under either approach used by the Courts of Appeals. The Court takes no position on the split.

must show that the "decisionmaker" responsible for the adverse action she suffered was aware of her disability. *Waggel*, 957 F.3d at 1374; *see also Johnson v. Jackson & Campbell, P.C.*, No. 98-cv-52, 1999 WL 1301234, at *4 (D.D.C. Mar. 1, 1999) ("[I]n order to demonstrate discrimination on the basis of a disability, the alleged discriminator must have knowledge that the disability exists." (characterizing *Hadberg v. Ind. Bell Tel. Co., Inc.*, 47 F.3d 928, 932 (7th Cir. 1995)). But the relevant adverse action is the decision by the 2023 Subcommittee to dismiss Ms. Iyer, which Dean Bass upheld by giving Ms. Iyer a choice of voluntary withdrawal or dismissal. *See Iyer*, 2025 WL 2192985, at *9. At that time, both the 2023 Subcommittee and Dean Bass were aware of ███████████'s determination that Ms. Iyer suffered from ███████████ ███████████████████████████████████, as well as her professional opinion that these conditions motivated her dishonest conduct. *See* Pl. Ex. 1, at 358–60; JSF ¶ 341. Thus, undoubtedly, a reasonable jury could determine that GW had "knowledge that the disability exist[ed]" and that it may have motivated Ms. Iyer's unprofessionalism at issue in the 2023 Subcommittee proceedings. *Johnson*, 1999 WL 1301234, at *4 (citing *Hadberg*, 47 F.3d at 932). The record therefore presents enough evidence from which a jury could conclude that Ms. Iyer was given the choice to voluntarily withdraw or be dismissed from the program because of her dishonesty and other unprofessional conduct—which she argues was a manifestation of her disability.

### 2. Otherwise Qualified

GW next argues that even if Ms. Iyer could satisfy causation, her discrimination claim fails because she is not "otherwise qualified" for the medical program. Mot. 28. Specifically, GW points out that "Dean Bass upheld the 2023 Subcommittee's decision dismissing Ms. Iyer because [she

concluded that] there [was] no accommodation that [the] medical school could provide to Ms. Iyer that would allow her to lie." JSF ¶ 112 (cleaned up). The Court agrees with GW.

Summary judgment may be appropriate in some discrimination claims when there is no genuine dispute that a plaintiff is not "otherwise qualified"—*i.e.*, "[i]t is undisputed that [the plaintiff] could not participate in [the school's] program unless the standards were substantially lowered" beyond that which is required by discrimination law. *Se. Cmty. Coll. v. Davis*, 442 U.S. 397, 410, 413 (1979). The "otherwise qualified" requirement is well-established in Rehabilitation Act jurisprudence. *See id.* But Ms. Iyer argues that it does not preclude her suit because (1) it does not apply in actions under Title III of the ADA, and (2) even if it does, she has presented adequate evidence for a jury to find that she is otherwise qualified to finish medical school. Opp'n 4–12. The Court takes each argument in turn.

First, the Court agrees with GW that the "otherwise qualified" requirement must be satisfied in this action. It is true that "Title III of the ADA contains neither the phrase 'otherwise qualified' nor 'qualified individual,' but such phrases are in Titles I and II, as well as in the Rehabilitation Act." *Singh v. George Washington Univ. Sch. of Med. & Health Scis.*, 508 F.3d 1097, 1105 (D.C. Cir. 2007). Title III instead provides that "modifications" to an educational program "need not be provided if they will fundamentally alter the nature of the program." *Mershon v. St. Louis Univ.*, 442 F.3d 1069, 1076 (8th Cir. 2006) (citing 42 U.S.C. § 12182(b)(2)(A)(ii)). "Although the language of the ADA and Rehabilitation Act differs," courts have determined that "the standards for determining liability under the two statutes are identical," *Bowers v. Nat'l Collegiate Athletic Ass'n*, 475 F.3d 524, 535 n.12 (3d Cir. 2007), as Title III's "fundamentally alter" language "implicitly incorporates the requirement that a [student] be 'otherwise qualified,'" *Halpern v. Wake Forest Univ. Health Scis.*, 669 F.3d 454, 461 n.3 (4th Cir.

2012) (collecting cases). And even Ms. Iyer appeared to acknowledge at the motion hearing that the "fundamentally alter" language in Title III serves the same purpose as the "otherwise qualified" requirement. Mot. Hr'g Tr. 41:1–8. Simply put, "[a]n educational institution is not required by the Rehabilitation Act or the ADA to lower its academic standards for a professional degree." *Mershon*, 442 F.3d at 1076. Rather, a student with a disability must "with reasonable accommodations" be able to "otherwise meet the academic standards of the program" under both Title III of the ADA and the Rehabilitation Act. *Doe v. Okla. City Univ.*, 406 F. App'x 248, 250 (10th Cir. 2010) (quoting *Mershon*, 442 F.3d at 1076).

This conclusion has special force in the medical-school context because Title III does not mandate participation or an accommodation that "poses a direct threat to the health or safety of others" that "cannot be eliminated by a modification of policies, practices, or procedures or by the provision of auxiliary aids or services." 42 U.S.C. § 12182(b)(3). And a "professional degree" "serves a gate-keeping function to graduate only persons who will make competent practitioners." *Neal v. E. Carolina Univ.*, 53 F.4th 130, 136, 153 n.16 (4th Cir. 2022) (cleaned up); *see also Davis*, 442 U.S. at 413 (nursing school need not make "substantial modifications of standards to accommodate" a disabled person because "the purpose of its program was to train persons who could serve the nursing profession"); Laura Rothstein, *Medical Education and Individuals with Disabilities: Revisiting Policies, Practices, and Procedures in Light of Lessons Learned from Litigation*, 46 J. Coll. & Univ. L.258, 266 (2021) ("The potential risk or threat to patients by health care professionals resulting from impairment . . . is an essential consideration in training and licensing health care professionals.").

Second, the Court also agrees that no reasonable jury could conclude that Ms. Iyer is "otherwise qualified" for medical school. "An otherwise qualified person is one who is able to

meet all of" the "academic and technical standards" of an education program "in spite" of her disability. *Davis*, 442 U.S. at 406 (cleaned up). And "technical standards" include "all nonacademic . . . criteria that are essential to participation in the program in question." *Id.* (cleaned up). Ms. Iyer must thus show: "(1) that [s]he could satisfy the essential eligibility requirements of the program, i.e., those requirements that bear more than a marginal relationship to the program at issue, and (2) if not, whether any reasonable accommodation . . . would enable [her] to meet these requirements." *Halpern*, 669 F.3d at 462 (cleaned up). No reasonable jury could conclude that Ms. Iyer has made this minimal showing.[6]

Essential requirements are either academic or non-academic standards "requisite to . . . participation in the school's education program or activity," *Davis*, 442 U.S. at 406 (cleaned up), and a school's "professional" standards commonly fit the bill, *see Waggel*, 957 F.3d at 1374; *Halpern*, 669 F.3d at 463. "[P]rofessionalism" includes "matters such as conduct toward faculty," effective and "timely communications," "class and meeting attendance," and honesty. *Neal*, 53 F.4th at 146; *see also Halpern*, 669 F.3d at 457, 465 (holding that ADHD and anxiety disabilities did not require medical school to excuse failure to appear at small group session, tardiness at lecture, and signing attendance sheet as if arrived on time); *Yaldo v. Wayne State Univ.*, 266 F. Supp. 3d 988, 1012 (E.D. Mich. 2017) (Severe depressive disorder and anxiety disabilities did not require medical school to excuse absences followed by false justifications and submission of altered accident and police reports to support such falsities.); *Davis*, 442 U.S. at 407–14 (Hearing

---

[6] GW objects to Ms. Iyer's discussion of reasonable accommodations because she has not brought a failure to accommodate claim. Reply 16–17. But Ms. Iyer only discusses reasonable accommodations because the availability of such an accommodation is an essential component of the "otherwise qualified" analysis. *See* Opp'n 6. Indeed, in arguing that Ms. Iyer is not otherwise qualified for its medical program, GW expressly argued that it cannot reasonably accommodate Ms. Iyer. *See* Mot. 30–31. Accordingly, this issue is properly before the Court.

disability did not require nursing school to dispense with requirement that students be able to effectively communicate with others.).

When such professional criteria appear in the official policies of a school, courts consider them essential requirements under Title III and Section 504. *See Zimmeck v. Marshall Univ. Bd. of Governors*, 106 F. Supp. 3d 776, 781 (S.D. W. Va.) (professional standards in the school's "Policy Regarding Academic and Professionalism Standards, Leaves and Appeals" were essential requirements), *aff'd*, 632 F. App'x 117 (4th Cir. 2015); *Halpern*, 669 F.3d at 463 (professional standards in the school's "Student Bulletin" were essential requirements). Here, GW's honor code provides:

> The School of Medicine and Health Sciences expects M.D. students to adhere to the high standards of behavior, integrity, character, and ethics befitting the medical profession. At a minimum this means student must: . . . [b]ehave honestly and ethically in their academic and professional pursuits; . . . [r]efrain from lying . . . ; . . . [p]rovide honest and accurate information on applications for residency, medical licensure, and membership in professional associations; . . . [and] [a]dhere to any other commonly understood principles of professional comportment.

Def. Ex. 61 § G(1). Accordingly, the requirement that Ms. Iyer "refrain from lying," *id.*, was an essential requirement of her program at GW.

Although Ms. Iyer disputes whether the otherwise qualified requirement applies in Title III cases, she concedes that an accommodation to lie "would fundamentally alter the nature" of GW's medical program under Tile III, 42 U.S.C. § 12182(b)(2)(A)(ii). *See* Mot Hr'g Tr. 40:12–16 ("[The Court]: But wouldn't saying: I would like to be able to be untruthful be a fundamental alteration? [Plaintiff's Counsel]: Yes. And we have never been asking for that, an alteration."); *cf.* Mot Hr'g Tr. 17:10–15.

Under either Party's approach, Ms. Iyer must thus "establish that some reasonable accommodation exists," *Ali v. Regan*, 111 F.4th 1264, 1280 (D.C. Cir. 2024), that "would have permitted [her] to satisfy this criterion," *i.e.*, to stop her from lying, *Halpern*, 669 F.3d at 465. *See*

*Snapp v. United Transp. Union*, 889 F.3d 1088, 1099–1100 (9th Cir. 2018) (collecting cases across circuits). Ms. Iyer can satisfy this burden in two ways. She can identify an accommodation (1) that is "reasonable on its face, *i.e.*, ordinarily or in the run of cases," or (2) that "is reasonable on the particular facts" of this case. *US Airways, Inc. v. Barnett*, 535 U.S. 391, 401, 405 (2002) (cleaned up). Ms. Iyer does not make either showing.

The first approach is of little help to Ms. Iyer. Courts have generally held that "excusing workplace misconduct to provide a fresh start/second chance to an employee whose disability [is] offered as an *after-the-fact excuse* is not a required accommodation under the ADA" and the Rehabilitation Act. *Trahan v. Wayfair Maine, LLC*, 957 F.3d 54, 65 (1st Cir. 2020) (emphasis in original) (quoting *DeWitt v. Sw. Bell Tel. Co.*, 845 F.3d 1299, 1316 (10th Cir. 2017)).[7] And Ms. Iyer did not attribute her conduct to her disability at the 2021 Subcommittee hearing. *See* JSF ¶ 29. Rather, ▮▮▮▮▮▮ brought up Ms. Iyer's disability at the 2023 Subcommittee hearing as an after-the-fact explanation for her dishonesty and other professionalism issues.

Neither has Ms. Iyer identified an accommodation that "is reasonable on the particular facts" of this case, though she comes closer. Ms. Iyer expressly disclaims that her "sought accommodation [i]s permission to lie." Opp'n 16. Rather, she proposes another "chance" to meet the school's standards while using the new medication and treatment prescribed by ▮▮▮▮▮▮. *See id.* at 18–19; Mot. Hr'g Tr. 2:24–4:4. Indeed, ▮▮▮▮▮▮'s letter and testimony to the 2023 Subcommittee made clear that it was her opinion that Ms. Iyer's existing ▮▮▮▮▮ both caused her "to lie" and underpinned the relevant professional misconduct. Pl. Ex. 1, at 360; *see also* Pl.

---

[7] *See also Bugg-Barber v. Randstad US, L.P.*, 271 F.Supp.2d 120, 131 (D.D.C. 2003); *McElwee v. Cnty. of Orange*, 700 F.3d 635, 641 (2d Cir. 2012); *Halpern v. Wake Forest Univ. Health Scis.*, 669 F.3d 454, 465 (4th Cir. 2012); *Siefken v. Vill. of Arlington Heights*, 65 F.3d 664, 666–65 (7th Cir. 1995); *Hill v. Kan. City Area Transp. Auth.*, 181 F.3d 891, 894 (8th Cir. 1999).

Ex. 51, at 25–28. And ▮▮▮▮▮▮ advised the Subcommittee that she had prescribed new medication that made her "confident" that Ms. Iyer could "succeed in her future training." JSF ¶ 305. This appears to be a sufficiently clear explanation of "the limitations imposed by a disability and the nature of the accommodation needed to remedy those limitations." *Waggel*, 957 F.3d at 1372. Ms. Iyer further contends that her completion of an MBA program "at Georgetown make[s] clear" that she could meet the essential requirements of GW's medical program with her new medication treatment and the other accommodations that she received there. Opp'n 17.[8] The Court agrees that if the record stopped at this, there would be a live question for the jury as to whether a reasonable accommodation would have permitted Ms. Iyer to be otherwise qualified for GW's medical program with her new medication. *See Steere v. George Washington Univ.*, 368 F. Supp. 2d 52, 57 (D.D.C. 2005) ("The doctrine does not apply to plaintiffs who, through no fault of their own, have not yet had a chance to get the modifications they need.").

But that is not the record before this Court. Based on the current record, "no reasonable jury could conclude" that the new treatment ▮▮▮▮▮▮ referenced in the February 2023 Subcommittee Meeting fixed Ms. Iyer's dishonesty and professional shortcomings. *Wardlaw v. Pickett*, 1 F.3d 1297, 1304 (D.C. Cir. 1993). Indeed, as GW points out, Ms. Iyer continued to have

---

[8] It is undisputed that Ms. Iyer did not herself request any accommodations for her disability at GW other than those related to testing. See JSF ¶¶ 119, 123. But there are instances where the "plaintiff's need for an accommodation" may be "so apparent that the defendant must offer one regardless of whether the plaintiff requested it." *Chenari*, 847 F.3d at 748. An accommodation is only reasonable in these circumstances if the defendant has notice of the existence of a disability, "the limitations imposed by a disability[,] and the nature of the accommodation needed to remedy those limitations." *Waggel*, 957 F.3d at 1372. The Court agrees that ▮▮▮▮▮▮'s testimony attributing Ms. Iyer's professional misconduct to her disability and identifying a new treatment to address those problems going forward would permit a jury to conclude that standard is satisfied. The Court is less convinced that GW had any notice of the other types of accommodations that Ms. Iyer eventually received at Georgetown. Regardless, the Court will consider both because Ms. Iyer's claim fails regardless.

problems with honesty and professionalism at Georgetown notwithstanding the new medication. *See* Mot. 30 n.6; Reply 13 n.4. Subpoenaed documents from Ms. Iyer's Georgetown MBA program show a worrying trend of dishonesty. Ms. Iyer falsely represented to Georgetown's admissions office that she "completed med school in May." Def. Ex. 65, at 12787. And as recent as April 2025, upon completion of her MBA program, Ms. Iyer again indicated on her commencement form that she had completed medical school. *Id.* at 12901. When pressed by school administrators on the discrepancy between her submission and online credentials, Ms. Iyer gave the following response, presumably referring to this Court's opinion at the motion-to-dismiss stage:

> In summary, the reason for the discrepancy is due to litigation.
>
> When I was in medical school, I was sexually harassed and faced retaliation for filing Title 9. So, after I got my M.D. and my National Provider Identification number and official license, I sued my medical school. They retaliated by threatening to revoke my degree, which led to me having to give up my matched residency spot. About 2 weeks ago, the judge ruled in my favor for retaliation, discrimination, breach of contract, and equitable relief.
>
> The official paperwork has yet to go through, so perhaps it would be best to leave it out for graduation.

*Id.* at 12901–02.

Ms. Iyer does not dispute that she sent this email. Mot. Hr'g Tr. 10:18–11:1. And Ms. Iyer's response provides a manifestly false description of both her academic credentials and proceedings before this Court. Ms. Iyer concedes that despite her claims in the email, she never had an M.D., *see id.* at 11:14–16, or medical license, *id.* at 12:16–20. She admits that her statements about GW retaliatorily threatening to revoke her degree and causing her to give up her residency spot were untrue. *Id.* at 13:14–22, 14:1–4. And she admits that she never received a favorable

24

ruling from this Court or any other court that would result in her receiving paperwork indicating that she is a doctor. *Id.* at 14:5–9; 14:22–23.[9]

Thus, the undisputed record shows that Ms. Iyer's dishonesty in an academic, professional setting continued after she started her new medication and throughout her studies at Georgetown. *See* Def. Ex. 65, at 12787, 12901–02. On this record, no reasonable jury could conclude that Ms. Iyer's proposed reasonable accommodation would have enabled her to satisfy the essential requirements of GW's medical school program by correcting the dishonesty and unprofessional behavior that she claims was a manifestation of her disability. *See Halpern*, 669 F.3d at 465. Indeed, when faced with the April 2025 email, Ms. Iyer all but conceded as much in the hearing before this Court. *See* Mot. Hr'g Tr. 18:9–13 ("[The Court:] I don't know how a jury can conclude that the medication fixed her lying. Tell me how one could. [Plaintiff's Counsel]: Yeah. I understand your point. It's difficult to explain that email away here."), 20:7–10 ("[The Court:] Tell me how a reasonable jury could conclude on this record and in light of this email that the medication fixed her lying. [Plaintiff's Counsel]: It would be very difficult to do that.").

Neither the ADA nor the Rehabilitation Act require "that discrimination plaintiffs should receive jury trials as a matter of course." *Waggel*, 957 F.3d at 1375 (quoting *Vatel v. All. of Auto Mfrs.*, 627 F.3d 1245, 1249 (D.C. Cir. 2011)). Here, the Court grants summary judgment for GW

---

[9] There are other incidents during Ms. Iyer's time at Georgetown that raise similar concerns. While still completing her studies, Ms. Iyer represented on her LinkedIn profile and personal website that she was "armed with an MBA." Def. Ex. 65, at 12918. There are also discrepancies regarding a car accident that prevented Ms. Iyer from taking an exam as scheduled. *See* Mot. Hr'g Tr. 7:9–9:3. And school administrators and professors expressed "concern[] about the number of makeup inquiries and requests [that Ms. Iyer] made over [her] time in the program," Def. Ex. 65, at 12911, and about Ms. Iyer's "academic performance" because she "missed 5 out of the 6 class sessions" a professor had held at that point, *id.* at 12886. GW claims that these incidents, too, establish Ms. Iyer's dishonesty while on her new medication. Mot. Hr'g Tr. 26:14–20. But Ms. Iyer tells another version of these incidents, *id.* at 7:9–9:3, so they are not undisputed, and the Court does not rely on them in reaching its conclusion.

on the discrimination claim because Ms. Iyer has "failed to identify evidence allowing a reasonable jury to conclude" that she was otherwise qualified for the medical program at GW. *Id.*

### C.    Retaliation

Next up is Ms. Iyer's retaliation claim under the ADA and the Rehabilitation Act. "To prevail on a retaliation claim under both the ADA and Section 504" the plaintiff "must show (1) she engaged in a protected activity, (2) the defendant took a materially adverse action against her, and (3) there was a causal connection between the protected activity and the adverse action." *Shinabargar v. Bd. of Trs. of Univ. of D.C.*, 164 F. Supp. 3d 1, 16 (D.D.C. 2016) (cleaned up). Ms. Iyer "concedes" that "the record contains insufficient evidence to proceed on the portion of her retaliation claim premised on retaliation by Dean Davis." Opp'n 2 n.1. Instead, Ms. Iyer asserts that Dr. Gaba sent letters of concern and testified at the 2023 Subcommittee hearing in retaliation for Ms. Iyer's complaint against her. Opp'n 20–21. Because Ms. Iyer cannot show causation on this theory of retaliation, the Court grants summary judgment in favor of GW.

"To show a causal connection, the plaintiff must show that . . . the decision-maker knew of her protected activity . . . . If the alleged retaliatory conduct occurred before the employee engaged in protected activity, the two events cannot be causally connected." *Calicchio v. Oasis Outsourcing Grp. Holdings, L.P.*, No. 21-12854, 2022 WL 2761720, at *4 (11th Cir. July 15, 2022) (per curiam) (first citing *Shannon v. BellSouth Telecomms., Inc.*, 292 F.3d 712, 716 (11th Cir. 2002); and then citing *Cotton v. Cracker Barrel Old Country Store, Inc.*, 434 F.3d 1227, 1233 (11th Cir. 2006)). GW argues that because Ms. Iyer's March 2023 formal complaint against Dr. Gaba postdated Dr. Gaba's letters and the 2023 Subcommittee hearing, Ms. Iyer cannot show that Dr. Gaba's letters and testimony were retaliation for that protected activity. Mot. 35. The Court agrees.

26

Ms. Iyer responds by reframing her protected activity as encompassing complaints beyond those filed pursuant to GW's Mistreatment Policy. *But see* Am. Compl. ¶ 62. She now asserts that she expressed other "concerns" and "complaints" about Dr. Gaba "well before" the submission of the letters of concern and hearing testimony. Opp'n 20. But even Ms. Iyer's reframed theory of retaliation fails on its face. Ms. Iyer points to three instances of protected activity: (1) complaints about Dr. Gaba made before her formal complaint, including a September 15 or September 16, 2022, complaint to DSS, (2) comments she made to Dr. Gaba at her mid-rotation meeting on September 22, 2022, and (3) her meeting with Dr. Keller in January 2023. *See* Opp'n 20–21.

Ms. Iyer's effort to string together vague or conclusory statements in the record is insufficient to withstand summary judgment. First, Ms. Iyer testified at her deposition that she complained to DSS on September 15th or 16th of 2022 that Dr. Gaba had engaged in disability discrimination, which she says is protected activity that supports her retaliation claim. CSDF ¶ 307; Pl. Ex. 5, at 342:9–17, 358:14–17; Opp'n 20. And Ms. Iyer says that other instances of protected activity included "rais[ing] complaints to others about Dr. Gaba prior to her formal complaint." CSDF ¶ 306; *see* Opp'n 20; Pl. Ex. 5, at 358:14-360:1, 360:4–12 ("I had been reaching out to multiple, like ombuds people saying, you know, asking to talk about this treatment from Dr. Gaba and then once Dr. Keller became, you know, the OPRL office was invented, I was able to go there. But I went to the ombuds people who said that they no longer were ombuds people. It was very confusing. But it was before those letters."). But Ms. Iyer has not pointed to any specific evidence corroborating or outlining the contents of these complaints. *See Jackson v. District of Columbia*, No. 25-cv-302, 2026 WL 493943, at *1 (D.D.C. Feb. 23, 2026) (A party opposing summary judgment "must utilize affirmative evidence and come forward with specific facts showing that there is a genuine issue for trial." (cleaned up)). Nor has she identified any evidence

27

that Dr. Gaba had any knowledge of these complaints. Ms. Iyer cannot rely "vague or conclusory" assertions like these to raise a genuine dispute of material fact. *Johnson v. Perez*, 823 F.3d 701, 710 (D.C. Cir. 2016). She has not provided sufficient evidence for a jury to conclude either that the contents of these complaints constitute protected activity or that Dr. Gaba had any knowledge of them based on this record.

Next, Ms. Iyer suggests that her September 22, 2022, mid-rotation feedback meeting with Dr. Gaba was protected activity that supports her retaliation claim. Opp'n 20. There, Dr. Gaba raised her concerns about Ms. Iyer's professionalism. JSF ¶ 140. And Ms. Iyer alleges that she "reminded Dr. Gaba she had ████ and Dr. Gaba's approach was making it worse." CSDF ¶¶ 169, 270; *see* Opp'n 20; Pl. Ex. 24, at 244 (Dr. Gaba also recognized in her letter that Ms. Iyer stated the inquiry was "making her ████."). Ms. Iyer, without citing to authority, suggests that this interaction constituted "advocacy that would qualify as protected activity." Opp'n 20. The Court disagrees—this is not the type of conduct that constitutes protected disability advocacy.[10]

It is true that "[a]dvocating for accommodations under the disability laws is protected activity." *M.L. v. Williamson Cnty. Bd. of Educ.*, 772 F. App'x 287, 291 (6th Cir. 2019). But the mere disclosure of a disability without a request for an accommodation is not. *See Rodriguez v.*

---

[10] Indeed, it is dubious whether Ms. Iyer's mere reference to ████ at her mid-rotation feedback meeting even "put [Dr. Gaba] on notice and charge[d] [her] with knowledge of a disability"—a prerequisite to bring this claim under the ADA and the Rehabilitation Act. *See Doe v. Bd. of Regents of the Univ. of Nebraska*, 846 N.W.2d 126, 148 (Neb. 2014) ("Doe's [ADA/Rehabilitation Act] case largely fails because Doe's testimony that he told some of the faculty members he was 'depressed' or 'stressed' was insufficient to rebut their testimony that they had no knowledge Doe suffered from a disability [of depressive disorder]. Vague or conclusory statements revealing an unspecified incapacity are insufficient to put the program on notice and charge it with knowledge of a disability." (citing *Morisky v. Broward Cnty*, 80 F.3d 445, 448 (11th Cir. 1996)). "Several courts have explained that mental disabilities, such as alleged here, are rarely open, obvious, and apparent." *Id.* at 147 (first citing *Taylor v. Principal Fin. Grp., Inc.*, 93 F.3d 155 (5th Cir. 1996), then citing *Miller v. Nat'l Cas. Co.*, 61 F.3d 627 (8th Cir. 1995), and then citing *Hedberg v. Ind. Bell Tel. Co.*, 47 F.3d 928 (7th Cir. 1995)).

*Unicity Int'l, Inc.*, No. 2:25-cv-754, 2025 WL 3539238, at \*5 (D. Nev. Dec. 9, 2025); *Lackey v. Heart of Lancaster Reg'l Med. Ctr.*, No. 15-cv-415, 2016 WL 5461185, at \*8 (E.D. Pa. Sep. 29, 2016), *aff'd*, 704 F. App'x 41 (3d Cir. July 27, 2017). So even assuming that Ms. Iyer's reference to ███████ was sufficient to charge Dr. Gaba with knowledge of a disability, Ms. Iyer's mere statement that "Dr. Gaba's approach was making it worse" was not a request for accommodations. CSDF ¶ 270; *see* Opp'n 20. An accommodation request, even if constructive, must provide notice of both "the limitations imposed by a disability and the nature of the accommodation needed to remedy those limitations." *Waggel*, 957 F.3d at 1372. A generalized assertion that an unspecified "approach" worsened the situation, lacking any further detail or next steps, accomplishes neither of these tasks. For these reasons, the September 22, 2022, mid-rotation feedback meeting was not protected activity—Ms. Iyer was not engaging in disability advocacy within the meaning of Title III or Section 504.

Finally, Ms. Iyer alleges that Dr. Gaba testified against her to retaliate for a January 2023 meeting with Dr. Keller, where Ms. Iyer raised concerns about Dr. Gaba's conduct. Opp'n 21. Ms. Iyer notes that Dean Keller met with Dr. Gaba about her student evaluations sometime after her meeting with Ms. Iyer, which included anonymously discussing the concerns raised by Ms. Iyer and similar concerns that may have been raised by other students. *Id.*; CSDF ¶¶ 312–16; Pl. Ex. 51, at 14–18, 39–42. And "while Dr. Keller did not identify Ms. Iyer by name," Ms. Iyer believes that Dr. Keller "*may* have informed Dr. Gaba of the existence of a complaint." Opp'n 21 (emphasis added). But again, such "speculation" does not create a genuine dispute of fact. *Solomon v. Vilsack*, 763 F.3d 1, 12 (D.C. Cir. 2014); *cf. Morris v. McCarthy*, 825 F.3d 658, 674 (D.C. Cir. 2016) (A plaintiff "cannot survive summary judgment if a jury can do no more than 'speculate' that [the decision maker] knew of her protected activity." (quoting *Talavera v. Shah*, 638 F.3d 303,

29

313 (D.C. Cir. 2011))). Ms. Iyer's belief that Dr. Keller "may have" informed Dr. Gaba of a complaint is not specific evidence upon which a jury could conclude that such a complaint caused Dr. Gaba's letters or testimony.[11]

Accordingly, because Ms. Iyer has failed to demonstrate that a relevant decision maker knew of any protected activity prior to taking adverse action, her retaliation claim fails as a matter of law.

### D. Breach of Contract

Finally, GW seeks summary judgment on Ms. Iyer's breach of contract claim. *See* Mot. 38. The Court previously held at the motion-to-dismiss stage that Ms. Iyer had sufficiently pleaded that GW's Mistreatment Policy, Pl. Ex. 72, constitutes an enforceable contract. *Iyer*, 2025 WL 2192985, at *11–12. Neither Party disputes that determination now. *See* Mot.; Opp'n. So the Court proceeds with that understanding.

The Parties disagree, though, about what "obligation[s] or dut[ies] ar[o]s[e] out of th[at] contract." *Id.* at *11 (quoting *Inst. of Multidimensional Med. v. Metagenics, Inc.*, 635 F. Supp. 3d 6, 13 (D.D.C. 2022)). Ms. Iyer argues that GW failed to comply with the Mistreatment Policy's procedures. Opp'n 22–26. GW strongly disagrees. Reply 23. But both Parties agree that there is no dispute over the material facts underlying this claim. Opp'n 23; Reply 23. Ultimately, the Court grants summary judgment in GW's favor because the undisputed record shows that GW complied with its contractual obligations.

The Mistreatment Policy establishes a two-step procedure to redress complaints of mistreatment:

---

[11] Although not material to resolving this question, many of the complaints raised in the November letter were identical to those in the earlier September letter of concern. *Compare* Pl. Ex. 24, *with* Pl. Ex. 25.

*Consultation Procedure:* First, the complainant must go through an informal consultation procedure where (i) she "may discuss the matter with the person who has engaged in the behavior or with his/her department chair, the clerkship director, the residency director, a member of the decanal staff, the relevant staff supervisor, or the Ombudsperson who shall be consulted, when appropriate, by any of the foregoing persons," and (ii) "[t]he Ombudsperson will provide a copy of this Policy to the person who has requested a consultation,[] respond to questions, and assist in developing strategies to address the matter." Pl. Ex. 72, at 771.

*Formal Complaint Procedure:* "If the matter is not satisfactorily resolved through the consultation procedure, then the person who made the allegation of mistreatment or the person against whom the allegation was made may initiate a formal complaint." *Id.*. "A formal complaint . . . is initiated by submitting to the Chairs of the Committee on the Learning Environment (CLE) a signed, written request to proceed with a formal complaint." *Id.* at 772. The formal complaint procedure then proceeds with the establishment of a panel, written submissions, interviews, a hearing, and finally a decision by the panel on whether mistreatment occurred. *Id.* at 772–73. If the panel determines mistreatment occurred, it may recommend "corrective or disciplinary action." *Id.* at 773. That recommendation will be forwarded to the Chair of the Committee on Learning Environment and a responsible official charged with reviewing, considering and implementing an appropriate response. *Id.*

Ms. Iyer argues that GW failed to comply with this procedure: (1) by failing to act on her formal complaint against Dr. Gaba from March 2023, and (2) by concluding the process in April 2023. Opp'n 23–26. The record is insufficient to support either argument.

First, Ms. Iyer contends that GW breached its contractual obligations by "fail[ing] to provide any of the formalized" complaint "procedures," *e.g.*, a hearing, interviews, and panel

31

decision, following Ms. Iyer's March 2023 written request to institute a formal complaint against Dr. Gaba. Opp'n 24. It is true that the Mistreatment Policy requires that the University follow a specific procedure to address a formal complaint. Pl. Ex. 72, at 772. But this "formal complaint procedure is available when the consultation procedure fails to resolve satisfactorily the allegation of mistreatment." *Id.* The policy does not allow for the filing of a formal complaint before a consultation is completed. Rather, the policy is clear—a formal complaint may only be filed "[i]f the matter is not satisfactorily resolved through the consultation procedure." *Id.* at 771. When Ms. Iyer filed her complaint in March 2023, she had not yet availed herself of the policy's consultation procedure—which involves interacting with an Ombudsperson, who will provide a copy of the Policy, respond to questions, and assist in developing strategies throughout the informal consultation process. *Id.* Indeed, Ms. Iyer did not "engage[] in the consultation process" with Ombudsperson Dr. Shwartz until April 2023—after the filing of her complaint. JSF ¶ 326.

Accordingly, GW did not breach its contractual obligations by failing to follow the formal complaint procedures after Ms. Iyer's premature March 2023 complaint. Despite some initial confusion, GW complied with its policy by instead referring Ms. Iyer to the informal consultation process and informing her that she "may initiate a formal complaint" at a later time should "the consultation procedure fail[] to resolve the allegations satisfactorily." JSF ¶ 157; Pl. Ex. 74.

Second, Ms. Iyer suggests that GW breached its policy by declining to initiate the formal complaint procedure at the conclusion of the consultation process. Opp'n 24–25. But the policy permits only Ms. Iyer or Dr. Gaba to "initiate a formal complaint" if "the matter is not satisfactorily resolved through the consultation." Pl. Ex. 72, at 771; *see also id.* at 772. Thus, GW had no obligation to *sua sponte* initiate formal proceedings without a post-consultation complaint by either Ms. Iyer or Dr. Gaba. And Ms. Iyer did not make such a complaint. *See* JSF ¶ 164.

Ms. Iyer tries to argue otherwise by fundamentally misconstruing the record at hand. She suggests that "[i]t was clear from [interim chair] Dr. Wasserman's 'decision'" in April 2023 "that GW would not address the matter further, and his decision was final"—attempting to justify her failure to file a post-consultation complaint. Opp'n 25. But Ms. Iyer's "conclusory" statement does not create a genuine dispute of fact. *Johnson*, 823 F.3d at 710. It is true that Dr. Wasserman's April 2023 email outlined his finding that no mistreatment occurred and stated, "this concludes the matter." Pl. Ex. 76; *see* JSF ¶ 330. But in doing so, he was only acting in an interim capacity to oversee Ms. Iyer's consultation process—which had concluded. JSF ¶¶ 324–25, 327. And Ms. Iyer was expressly told the prior month that she could file a formal complaint if she found his determination unsatisfactory. Pl. Ex. 74. No reasonable jury could conclude on this record that GW disavowed all its prior communications promising Ms. Iyer "that the formal complaint procedure" would be "available when the consultation procedure fails to resolve satisfactorily [her] allegation of mistreatment." Pl. Ex. 74. Rather, the undisputed record simply shows that Ms. Iyer did not file and still has not filed any complaint or appeal following GW's conclusion of the consultation process. *See* JSF ¶ 164. Rather than file a post-consultation formal complaint, Ms. Iyer filed this lawsuit.

Ms. Iyer responds by arguing that "GW does not identify any appeals procedure, let alone one that was communicated to Ms. Iyer" on how to proceed after a decision was reached in the consultation process. Opp'n 25. But again, this argument misconstrues the record. It is true, as Ms. Iyer highlights, that the interim chair did not identify any next steps in the April 2023 email concluding the consultation process. JSF ¶ 330. But the record clearly shows that in the prior month, Dr. Keller both informed Ms. Iyer that she had the right to institute a formal complaint after the interim chair concluded the consultation, Pl. Ex. 74, and provided her with a link to the

Mistreatment Policy, Pl. Ex. 73, which outlined how to institute a formal complaint through a signed, written request to the Chairs of the Committee on the Learning Environment, Pl. Ex. 72, at 772. Accordingly, a jury could not reasonably find that Ms. Iyer was denied the requisite information needed to file and institute a formal complaint.

Instead, Ms. Iyer's breach of contract claim largely complains of GW's lackluster communication throughout the mistreatment complaint process. *See* Opp'n 24 (complaining that Dr. Keller's initial misunderstanding of the two-step process required Ms. Iyer "to start over" weeks after she raised her concerns and delayed ultimate resolution of her allegations); *id.* (complaining that Dr. Keller told Ms. Iyer that she would let her know when an interim chair was selected but ultimately failed to do so); *id.* at 25 (complaining that Dr. Wasserman did not include next steps in his April 2023 email, which would have been helpful to Ms. Iyer). Although GW's communication throughout this process could have been clearer, Ms. Iyer does not identify any information that GW failed to communicate to her that it was contractually obligated to disclose. Pl. Ex. 72, at 771 (confirming that the policy only requires that the Ombudsperson provide a copy of the policy, answer questions, and assist in developing strategies at the consultation stage); JSF ¶ 160 ("Admitt[ing] that Ms. Iyer completed the consultation process with Lisa Schwartz," the Ombudsperson.). Ms. Iyer's generalized complaints about poor communication and disorganization are not a sufficient basis on which a jury could conclude that GW breached any specific contractual duty. Accordingly, the Court grants summary judgment to GW on the breach of contract claim as well.

## CONCLUSION

For these reasons, the Court grants GW's Motion for Summary Judgment, ECF No. 45. A separate order will issue.

_____
SPARKLE L. SOOKNANAN
United States District Judge

Date:   May 13, 2026

35